No. 79,199

STATE OF KANSAS, *Appellee*, v. LARRY HUMPHERY, *Appellant*.

(978 P.2d 264)

Opinion filed April 16, 1999.

Karen A. Eager, assistant appellate defender, argued the cause, and Michael J. Helvey, assistant appellate defender, and Jessica R. Kunen, chief appellate defender, were on the brief for appellant.

Sheryl L. Lidtke, assistant district attorney, argued the cause, and Nick A. Tomasic, district attorney, and Carla J. Stovall, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by defendant Larry Humphery from his conviction of first-degree felony murder (K.S.A. 21-3401), aggravated burglary (K.S.A. 21-3716), and criminal possession of a firearm (K.S.A. 1996 Supp. 21-4204). Humphery claims trial error on the following grounds: (1) improper exclusion of evidence, (2) failure to grant a mistrial, (3) failure to give an informant and accomplice cautionary instruction, and (4) cumulative error.

Ronald Sedore, the victim, was a Canadian over-the-road truck driver who was shot and killed as he sat in the cab of his 18-wheeler truck in front of a house at 815 Troup, in Kansas City, Kansas.

When we view the evidence in a light most favorable to the prevailing party (as we are required to view it), the evidence is as follows: Sherri Simmons was a witness for the State. She testified that she had lived at 815 Troup with Clarence Smith and a friend. When Sedore was shot and killed, she lived at 617 Troup, although she stayed at 815 Troup "off and on." She also kept clothing at 815 Troup. Simmons testified that on August 11, 1996, she was walking on 7th Street in Kansas City, Kansas, when she noticed an 18-wheeler truck parked by the side of the street. Sedore was examining a map and appeared lost, so Simmons approached him and asked him if he needed directions. He said he was looking for the GM plant in Fairfax. Sedore seemed confused when Simmons gave him directions, so she got in his truck to ride with him and give him directions.

After Sedore dropped his trailer off at the plant, Simmons told Sedore she wanted to get some drugs. He gave her $20 for the drugs and dropped her off at 7th and Garfield. She bought crack cocaine and smoked it in an abandoned house next door to a drug dealer's house.

After the 7th and Garfield drug stop, Simmons returned to Sedore's truck. He drove to a convenience store, bought Pepsi and cigarettes for her, and proceeded to a truck stop on 18th Street. Simmons testified that she and Sedore had sexual intercourse at the truck stop in a bed in the back of the truck. Simmons said Sedore did not offer her any money for sex and she had sex with

him because "[a]nything I wanted I got. So, I mean, I wasn't . . . interested in this man, so that's how it was. It wasn't— no one was buying no one. He was not buying me." After they had sex, Simmons told Sedore she wanted to get more drugs and directed him to drive to 815 Troup. Sedore gave Simmons $40 and parked his truck in front of 815 Troup. Simmons went inside and Sedore stayed in his truck with the motor running.

Defendant Larry (a/k/a Jay) Humphery, Simmons, Marcus (a/k/a Malcolm) Coleman, Sanford Clardy, and Charles Kelsey, among others, were at 815 Troup the night Sedore was killed. Clarence Smith, who lived in the first floor apartment at 815 Troup, as well as Irving Jordan, who lived in the basement apartment, were also present that night.

Humphery, Coleman, and Clardy were standing outside of 815 Troup as Simmons approached the house. She asked them if they had any drugs and they all went inside the house. Simmons bought some crack and started getting high. The prosecutor asked Simmons whether she talked to Humphery, Coleman, and Clardy after they went in the house, and Simmons responded that when she was smoking someone came into the house and said that the three men were going to rob Sedore. The defense objected to this statement, the judge sustained the objection, and the defense requested a mistrial because the jury had heard evidence which the trial judge had previously ruled inadmissible. The judge refused to grant a mistrial because Simmons had already properly testified that "she asked those three not to rob the truck driver, so the implication of a robbery is already there." The judge then admonished the jury to disregard the comment.

Simmons then stated that when Humphery, Coleman, and Clardy left the house and went outside, she remained inside smoking for a few minutes and then went outside where "all of them were in the yard talking." As she was walking towards Sedore's truck, Kelsey was pulling on her and asking her to give him back his jacket. Simmons told Kelsey to wait because she "was trying to get to the truck driver before anything happened." Simmons and Humphery reached the truck at about the same time. Simmons testified she was standing next to Humphery on the running board

of the truck beneath the passenger door and started bumping into him, telling him not to do whatever he was planning to do. She said Humphery then made a gesture towards his waist indicating he had a gun and told her to leave. Simmons then stepped down from the truck.

Simmons said she then went back inside 815 Troup and closed the door. She heard a gunshot and looked out the window. The gunshot had shattered the passenger's side window of the truck. Simmons did not see a gun in Humphery's hand and did not see a flash or a light from a gun. Shortly after she heard the gunshot, she saw Humphery, Clardy, and Coleman "going up in the truck." She saw the three men taking Sedore's belongings and noticed that one of them had Sedore's television, but stated, "I don't know who had exactly had it 'cause it was dark and plus I was tripping off the fact that—what they had done." When asked whether she heard anyone say anything, she responded, "Yeah. Someone, I think it was Marcus, said that, Jay, you fucked up, or something like that. I heard something in that category when I was looking out the window."

Shortly thereafter, Simmons left 815 Troup and went to her cousin Diane Jennings' house. Kelsey was also at Jennings' house and Simmons stayed there for about a half hour. She then went to the Chelsea apartments where she met with Humphery, Coleman, and Clardy.

Simmons denied that she was a prostitute. She denied killing Sedore and denied setting him up for a robbery. She was asked on cross-examination, "Isn't it a fact that you told a friend that you had turned a trick for the victim and you were trying to rob him and he fought you and you killed him?" She responded, "I never told anybody such a thing 'cause I don't condone murder."

Kelsey described 815 Troup as "a good time house" because people would go there to "drink, get high and stuff like that." He said that the night Sedore was killed, he had seen a white truck with its motor running in front of the house. Kelsey testified that Simmons, Humphery, Coleman, and Clardy were in the kitchen and Simmons was smoking crack and talking about a truck driver. Humphery, Coleman, and Clardy went outside. Simmons contin-

ued smoking for a few more minutes and then also went outside. Kelsey followed Simmons, asking her to return a jacket she had borrowed from him, but she told him to wait and proceeded to the truck.

Kelsey saw Simmons climb up the stepladder on the side of the truck and talk to the truck driver, although he could not hear the conversation because of the noise from the truck's engine. Simmons spoke with the truck driver for about 5 to 7 minutes and started coming back to the yard. Humphery then climbed up on the truck and talked to the driver for about 4 to 5 minutes. Kelsey said that he was in the yard talking to Coleman and Clardy at this point and he thought Simmons was inside the house, although she could have been on the sidewalk. He then heard a loud pop, which he thought was a gunshot, but he did not hear glass shattering. Kelsey never saw Humphery with a weapon, either before or after the shooting. He ran from the scene with Humphery, Coleman, and Clardy as soon as he heard the shot.

Approximately 1 week after the shooting, the police again questioned Kelsey about the incident and asked him who had pulled the trigger. The police showed him some pictures and he identified Humphery as the shooter.

Police officer Michael York testified that the morning after the shooting, he responded to a "disturbance call" at 815 Troup. It is not clear who was involved in the events leading to the disturbance call, but York testified his notes indicated Irving Jordan was not involved. York spoke with Jordan while another officer spoke with a female battered in the incident. York asked Jordan whether he had any information or knew anything about the homicide that occurred outside of his residence. Jordan said he did not. A few minutes later, however, he approached York's police car and told him the night before "[h]e was standing at the front door when he observed two black males come out of the weeds of 811 Troup and the two black males were—he knew as Jay and Malcolm and Jay came up to the victim and shot him in the truck."

Detective Clyde Blood, of the Kansas City, Kansas, Police Department, was the lead detective in the investigation into Sedore's murder. He testified that the day after the murder, an officer in-

volved with the TIPS hot line from the Kansas City Crime Stoppers contacted him and a conference call was set up with Blood and an anonymous female. Blood testified the anonymous caller told him she had a "friend named Sherri Simmons who lives at 617 Troup. She had talked to Ms. Simmons during the afternoon of August 12th, '96, and Ms. Simmons had admitted to her that she had shot and killed a truck driver at 8th and Troup." The defense wanted the TIPS phone call admitted into evidence. Prior to trial, the judge ruled the TIPS call was inadmissible hearsay. Also, during the trial, the court ruled that Blood's direct examination testimony was not such that could allow the TIPS call to be admitted on cross-examination.

Blood testified that he believed Simmons was a prostitute who had solicited Sedore. He stated it was a common occurrence for a prostitute to escort a truck driver to a location where the truck driver could be robbed. Blood initially thought that Simmons might have killed Sedore herself. He had received information that Simmons had been with Sedore shortly before his death and that Sedore may have been lured to 815 Troup for the purpose of a robbery. Simmons was brought into the police station for an interview. Blood advised her of her *Miranda* rights and told her she was a possible suspect in a homicide. Simmons then told him that she was not involved in any homicide, but she had been at the scene and would tell him everything she knew. She further stated that she "didn't want to go to jail for something she didn't do."

Simmons named Humphery as the shooter and identified him from a computer photo. Blood stated Kelsey had also identified a picture of Humphery as the shooter. Kelsey told Blood he had seen Humphery approach the truck and, based on earlier observations, Kelsey determined that Humphery "was about to rob the truck driver, so he turned around and started to walk away. He saw Jay go up on the truck, actually climb up the saddle tank and he started to walk away and leave the area and that's when he heard a gunshot."

On January 16, 1997, the jury found Humphery guilty as charged. Humphery was sentenced to life imprisonment on the felony murder charge to be served consecutive to his 29-month

sentence in No. 95 CR 1733. Humphery was sentenced to 34 months' imprisonment on the aggravated robbery charge, and 9 months' imprisonment on the firearm charge. These sentences were ordered to run concurrent with the life sentence. Humphery timely filed his appeal. This court has jurisdiction pursuant to K.S.A. 22-3601(b)(1).

## I. TIPS HOT LINE TELEPHONE CALL

The State presented an oral motion in limine before the start of the trial, requesting the prohibition of any testimony regarding the anonymous phone call made to the TIPS hot line. The police report documenting the TIPS call described it as follows:

"Caller stated that the suspect was frantic and told the caller that she had turned a trick for the victim and while she was attempting to rob him, the suspect killed the victim. She then named that suspect as Sherri Simmons, gave an address, a physical description, age, race, height, weight, color of hair, and color of eyes."

Blood also prepared a report regarding the TIPS call. He stated in pertinent part:

"I was contacted by Officer Kevin Cromwell of the Kansas City Crime Stoppers who set up a conference call with an anonymous black female. . . . [T]he person told me that she has a friend named Sherri Simmons who lives at 617 Troup. She had talked to Ms. Simmons during the afternoon of August 12th, '96, and Ms. Simmons had admitted to her that she had shot and killed a truck driver at 8th and Troup.

"Ms. Simmons advised that she had agreed to perform a sexual service for the driver and escorted him to 8th and Troup where she proceeded to rob him. The driver tried to fight, so she shot him. The caller advised that . . . she is to meet with Simmons again and will try to gain additional information. The call was terminated."

Humphery correctly acknowledges that the hot line caller's statements were hearsay within hearsay and, thus, a hearsay exception was necessary for both links in the hearsay chain. K.S.A. 60-463 provides:

"A statement within the scope of an exception to K.S.A. 60-460 shall not be inadmissible on the ground that it includes a statement made by another declarant and is offered to prove the truth of the included statement if such included statement itself meets the requirements of an exception."

The defense asserts the first link in the chain, what Simmons said to the caller, falls under the hearsay exception for "admissions by parties." This exception to the hearsay rule provides that hearsay evidence is inadmissible except "[a]s against a party, a statement by the person who is the party to the action in the person's individual or a representative capacity and, if the latter, who was acting in such representative capacity in making the statement." K.S.A. 1996 Supp. 60-460(g). The defense claims that what Simmons said to the caller was clearly an "admission." This reading of the statute does not support the argument that what Simmons said to the caller was an admission as contemplated under the cited hearsay exception. Simmons is a witness, not a party, in this action. The statute indicates that it applies to admissions *by parties*. Thus, Humphery's argument fails the first link in the hearsay chain.

Humphery argues that the second link, what the caller said to Blood, meets the statutory requirements of K.S.A. 1996 Supp. 60-460(d)(3). This statute provides in pertinent part that a statement shall not be excluded as hearsay if the judge finds the statement was made by a declarant who is unavailable as a witness and "by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort."

The caller's statements to Blood do not meet the requirements of K.S.A. 1996 Supp. 60-460(d)(3). The trial judge correctly ruled that the TIPS call was inadmissible hearsay because of the impossibility of testing whether the declarant making the TIPS phone call was reliable, whether the declarant had a clear recollection of events, whether the statements were made in good faith, and whether the statements were made with no incentive to falsify or to distort. In conclusion, under the facts of this case, the trial judge correctly ruled that K.S.A. 1996 Supp. 60-460(d)(3) was not applicable and appropriately excluded the substance of the TIPS call as impermissible hearsay evidence.

Humphery argues that in the alternative the statements made in the TIPS call were not hearsay because they could be offered not to prove their truth, but to show that Blood did an inadequate job

conducting the investigation by failing to sufficiently follow up on all leads available to him. Testimony "is not inadmissible as hearsay evidence when it is not offered to prove the truth of the matter asserted." *State v. Ritson*, 215 Kan. 742, Syl. ¶ 6, 529 P.2d 90 (1974).

Humphery asserts the admission of the TIPS call was necessary to show that the police should have asked Simmons whom she had talked to the day after the shooting. By failing to ask Simmons this question, the police disregarded information essential to the theory of defense that Simmons, not Humphery, killed Sedore. This argument is not convincing. The trial court did not prohibit Humphery from questioning Blood about the fact that he had leads or information from the TIPS hot line. The ruling only prohibited the admission of the statements themselves.

The judge correctly ruled that admitting the evidence to show that the police had conducted an inadequate investigation would be admitting the evidence through the "back door." The judge, however, stated that he would give the defense leeway with questioning Blood about why he did not pursue certain suspects and whether he pursued all available information that would tend to exculpate Humphery.

Defense counsel also argued that subsequent to the court's ruling granting the State's motion in limine to disallow the evidence, Blood's direct testimony had

"opened the door for me to inquire into that area. And my point is this, not a question I asked, the State asked him, did you have—something to the effect of what information did you have about Sherri Simmons before you took her statement. His statement was, we had information she had been present when the crime had occurred. That's the information. Now that's been given to the jury. That's not completely true. In addition to that, he had information that she had, in fact, committed the crime. . . ."

Again, in the alternative, the defense claimed Blood's testimony allowed admission of the call on cross-examination to show police conduct, rather than for the truth of the statements. The defense argued that the State chose to inquire what Blood's information regarding Simmons was before he had questioned her and Blood testified about all his information with the exception of the TIPS

call. Defense counsel argued that this "opens the door for me to go into the full picture because they're not getting—the jury is not getting the whole picture." The trial judge disagreed and explained:

"I don't think it opens the door in the way that you think it does. And I don't think I can let you ask that question because that assumes that fact, which is not going to be put into evidence, and that is the anonymous phone call because it—there's no way to test the reliability, the good faith, [or any] of the things that the statute implies about hearsay statements. There's nothing about receiving a phone call unidentified and anonymous that gives it any indicia of reliability whatsoever. . . ."

This court applies the abuse of discretion standard when reviewing a trial court's decision regarding a motion in limine. *State v. Rowell*, 256 Kan. 200, 208, 833 P.2d 1184 (1994). Also, the admission or exclusion of hearsay evidence is within the sound discretion of the trial court. *State v. Thomas*, 252 Kan. 564, 572, 847 P.2d 1219 (1993.) Humphery claims the trial court's ruling prevented him from fully cross-examining Blood and, thus, prevented him from presenting a complete defense in violation of his Sixth Amendment right to confront the witnesses against him. He also maintains this ruling denied him a fair trial because it violated his due process rights under the Fourteenth Amendment to the United States Constitution.

In *State v. Bratt*, 250 Kan. 264, 824 P.2d 983 (1992), this court examined the effect of the Confrontation Clause on the admissibility of hearsay statements in a criminal trial. The *Bratt* court considered the decisions of the United States Supreme Court in *Idaho v. Wright*, 497 U.S. 805, 111 L. Ed. 2d 638, 110 S. Ct. 3139 (1990), and *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 107 S. Ct. 2531 (1980), and held:

"The Confrontation Clause operates in two ways when determining the admissibility of hearsay statements. First, the Sixth Amendment establishes a rule of necessity. In the usual case, the prosecution must either produce or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant. Second, once a witness is shown to be unavailable, the witness' statement is admissible only if it bears adequate indicia of reliability. Reliability can be inferred where the evidence falls within a firmly rooted hearsay exception. If the evidence does not fall within a firmly rooted hearsay exception, the evidence

must be excluded absent a showing of particularized guarantees of trustworthiness." 250 Kan. 264, Syl. ¶ 1.

The *Bratt* court further explained the requirement of particularized guarantees of trustworthiness:

"Particularized guarantees of trustworthiness required for admission of a hearsay statement under the Confrontation Clause must be shown from the totality of the circumstances that surround the making of the statement and that render the declarant particularly worthy of belief. Evidence possessing particularized guarantees of trustworthiness must be at least as reliable as evidence admitted under a firmly rooted hearsay exception and must be so trustworthy that adversarial testing would add little to its reliability." 250 Kan. 264, Syl. ¶ 2.

Humphery asserts that recent Kansas cases require as a matter of fundamental fairness that the hearsay rule should not bar exculpatory statements associated with a witness who also provides incriminating statements. Humphery argues the trial court's exclusion of the TIPS call containing exculpatory evidence while allowing Simmons' incriminating statements into evidence was so unfair that it amounted to a denial of due process which deprived him of his right to a fair trial. Humphery cites *State v. Hills*, 264 Kan. 437, 957 P.2d 496 (1998), as authority for this assertion. The *Hills* court stated that "[w]here the State has introduced portions of a defendant's statement which are incriminating, the defendant is allowed to introduce the exculpatory portions of his or her statement, even though the defendant does not intend to testify and such evidence would be barred by the hearsay rule." 264 Kan. 437, Syl. ¶ 3.

The *Hills* case is readily distinguishable from the case before us. The *Hills* court held the trial court erred when it excluded exculpatory hearsay statements made by the defendant in a videotaped interview, but admitted the inculpatory portions of the videotape. The *Hills* case does not support the conclusion that the trial court's rulings regarding the admission of hearsay evidence were erroneous in the present case.

In conclusion, the trial court did not abuse its discretion by granting the State's motion in limine to disallow admission of the TIPS call into evidence. Likewise, the trial court did not abuse its discretion by ruling the TIPS call was inadmissible to show inadequate police investigation or by ruling that Blood's direct testi-

mony did not make the evidence admissible during cross-examination. Judicial discretion is abused only when no reasonable person would take the view adopted by the trial court. See *Saucedo v. Winger*, 252 Kan. 718, 729-30, 850 P.2d 908 (1993). The trial court correctly relied on the required elements for the admission of hearsay evidence. The statements made by an anonymous person to the TIPS hot line did not bear the adequate indicia of reliability. It was impossible to determine whether the caller/declarant making the TIPS call was reliable, whether the declarant had a clear recollection of events, whether the statements were made in good faith, and whether the statements were made with no incentive to falsify or to distort. Thus, the trial court's exclusion of the content of the TIPS call did not deprive Humphery of the right to sufficiently cross-examine a witness or deny him the opportunity to present a complete defense.

## II. MOTION FOR A MISTRIAL

"Terminating a trial and declaring a mistrial is largely within the discretion of the trial court. A clear showing of abuse of discretion must be made before the decision of a trial court will be set aside on appeal. [Citations omitted.]" *State v. McGhee*, 226 Kan. 698, 702, 602 P.2d 1339 (1979). "The general rule is that an admonition to the jury normally cures the prejudice from an improper admission of evidence. [Citations omitted.]" 226 Kan. at 702. Further,

"[t]he judge's power to declare a mistrial is to be used with great caution, under proper circumstances, to insure that all parties receive a fair trial. When an event of prejudicial misconduct, the damaging effect of which cannot be removed by admonition and instruction, is presented to the jury, the trial judge should declare a mistrial. [Citation omitted.]" *State v. Chandler*, 252 Kan. 797, 801, 850 P.2d 803 (1993).

Before the trial began, the State gave notice that it wished to introduce the hearsay statements of Coleman and Clardy under a hearsay exception pursuant to K.S.A. 1996 Supp. 60-460(i)(2). K.S.A. 1996 Supp. 60-460(i)(2) provides that hearsay evidence is inadmissible except

"(i) [a]s against a party, a statement which would be admissible if made by the declarant at the hearing if . . . (2) the party and the declarant were participating

in a plan to commit a crime or a civil wrong and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before its complete execution or other termination. . . ."

The State wanted to introduce the statements that "someone" had told Simmons just prior to the murder that Humphery, Coleman, and Clardy were talking about robbing Sedore. The State proffered these statements would show the three men had talked about "going out and robbing the victim, Mr. Sedore, and that the defendant was involved in the conspiracy. And then, in fact, the defendant did go out and carry out that conspiracy and in the course of committing a felony, he did kill Mr. Sedore."

Conspiracy charges against Humphery, Coleman, and Clardy were dismissed at the preliminary hearing. The judge then ruled that the State's proposed evidence was hearsay evidence, given that Coleman and Clardy were not going to testify at Humphery's trial.

During Simmons' direct examination, Sheryl Lidtke, the prosecutor, asked Simmons whether she had spoken with Coleman, Clardy, and Humphery while she was smoking crack. Simmons responded that she had briefly spoken with them, but "I didn't say too much to none of them after I had got my drugs." The following questions and answers then took place:

"Q. [Lidtke] Don't talk to me about what they said. Just answer my questions—

"A. [Simmons] Okay.

"Q. [Lidtke)]—best you can. Without telling me anything that they said, did you hear them talking among themselves?

"A. [Simmons] No.

"Q. [Lidtke] Okay. Did you make statements to them about the truck driver?

"A. [Simmons] No, just that I was leaving.

"Q. [Lidtke] Did you make any statements to them or ask them to do or not to do anything?

"A. [Simmons] Yeah, I asked them not to rob him.

"Q. [Lidtke] Okay. And who specifically did you say that to?

"A. [Simmons] To all of them.

"Q. [Lidtke] Okay. Including Jay?

"A. [Simmons] Yeah, all of them.

"Q. [Lidtke] All right. Did you make any statements to Jay or any—any of the people in his presence about what the truck driver might or might not have?

"A. [Simmons] No, I—no, I—it wasn't like that. I just—

"Q. [Lidtke] Okay. All right. Was this before or after or during your smoke of the crack that you were making these statements to them?

"A. [Simmons] Well, when I was smoking, I was sitting there. I was giving some other people some dope and it ended up somebody coming in and told me that they were going to rob them.

"Q. [Lidtke] Okay.

"A. [Simmons] And so that's when I left and—

Mr. Sachse: Judge, objection.

The Court: Objection is sustained."

Defense counsel then asked to approach the bench and stated, "Judge, I'm gonna ask for a mistrial." The judge ruled he would not grant a mistrial and stated that Simmons had already testified that "she asked those three not to rob the truck driver, so the implication of a robbery is already there. And I don't think the comment is improper, though it *maybe substantially prejudices* the rights of your client. I will admonish the jury if you wish to disregard the last question." (Emphasis added.) Defense counsel responded, "For the record, Judge, it is evidence of an element of felony murder, which is what my client stands charged with, so I think it substantially prejudices him. I—I will request the Court to admonish the jury to disregard that statement." The judge then admonished the jury that "the last question and answer was improper. I have sustained the objection and you are not to consider that in your deliberations."

Humphery argues that the State's line of questioning during Simmons' direct examination was designed to elicit the testimony ruled inadmissible that before the shooting, one of Humphery's companions had said they were going to rob the truck driver. Humphery contends the statement that the group intended to commit the robbery was direct evidence of an element of felony murder and the trial court's admonition to the jury to disregard the statement was insufficient to cure the prejudicial effect of the testimony. The defense cites *State v. Lewis*, 238 Kan. 94, 708 P.2d 196 (1985), in support of its argument that the trial court should have declared a mistrial because the damaging effect of the prejudicial event was not amenable by admonition and instruction to the jury. The *Lewis* case is distinguishable on its facts from the case before us.

In *Lewis*, the Kansas Bureau of Investigation lab report stated no blood was on a knife found in defendant's possession. The State's expert witness told the prosecution that the victim's blood was on the knife and that the written report was in error. The prosecutor did not inform the trial judge or defense counsel of the error. The prosecutor waited until the final question on direct examination to have the witness reveal that blood was on defendant's knife and that it was the victim's blood. The trial court struck the evidence and instructed the jury to disregard any testimony as to the presence of blood on the knife.

The *Lewis* court first noted that "[t]he granting of a mistrial is a matter within the discretion of the trial court. The judge's power to declare a mistrial is to be used only with great caution, under proper circumstances, to insure that all parties receive a fair trial." 238 Kan. at 97. Further, "[t]his court has stated a number of times that an admonition to the jury normally cures prejudice from an improper admission of evidence. *State v. Mick*, 229 Kan. 157, 161, 621 P.2d 1006 (1981); *State v. McGhee*, 226 Kan. 698, 702, 602 P.2d 1339 (1979)." 238 Kan. at 99. However, under the facts, the *Lewis* court found that the trial court should have granted a mistrial, given the State's use of the corrected report to defeat the entire theory of defense which had relied on the original report. The *Lewis* court stated:

> "It is necessary when justice so requires to declare a mistrial where there is some fundamental failure of the proceeding. When an event of prejudicial misconduct, the damaging effect of which cannot be removed by admonition and instruction, is presented to the jury, the trial judge must declare a mistrial. In the present case, the State's introduction of evidence, of which the defendants' counsel were unaware and which destroyed the defense strategy, is such an event requiring a mistrial." 238 Kan. at 97.

K.S.A. 22-3423(1)(c) provides that the trial court may terminate the trial and order a mistrial at any time if the trial court determines termination is necessary because "[p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." Upon appellate review, the abuse of discretion standard is applied in reviewing a motion in limine. *Rowell*, 256 Kan. at 208.

"A two-part test evaluates alleged violations of a motion in limine. First, there must be a determination whether there was a violation of the order in limine. Second, if the order in limine is violated, there must be a determination whether the testimony elicited in violation of the order substantially prejudiced the defendant. [Citation omitted.] The burden is on the defendant to show he or she was substantially prejudiced. [Citation omitted.]" *State v. Warden*, 257 Kan. 94, 125-26, 891 P.2d 1074 (1995).

See *State v. Aikins*, 261 Kan. 346, 376, 932 P.2d 408 (1997).

The judge ruled that statements by Coleman and Clardy were inadmissible hearsay, given that they were unavailable to testify. Thus, the first question becomes whether Simmons' statement that someone came in the house and said that they were going to rob Sedore violated the order in limine.

The trial court noted that the statement might have substantially prejudiced Humphery's rights and admonished the jury to disregard the statement. Thus, the trial court apparently determined that the order had been violated. In *State v. Arteaga*, 257 Kan. 874, 886, 896 P.2d 1035 (1995), the court stated:

"The trial court may declare a mistrial if prejudicial conduct makes it impossible to proceed with the trial without injustice to the defendant or to the State. K.S.A. 22-3423(1)(c). Declaration of a mistrial is a matter entrusted to the trial court's discretion and will not be disturbed on appeal absent a clear showing of abuse of discretion. [Citations omitted.] The defendant has the burden of showing substantial prejudice before an appellate court will find an abuse of discretion by the trial court."

The jury had already heard through proper testimony that Simmons asked Humphery, Coleman, and Clardy not to rob Sedore. Therefore, a statement regarding a plan or an intent to rob Sedore was a not a surprise to the jury or something that the jury would never have known had it not been for the improper admission of evidence.

In conclusion, there was no prejudicial error requiring reversal of Humphery's conviction. Nothing suggests that the judge's admonition did not sufficiently cure Simmons' inappropriate statement, and the admission of the complained of statement did not make it impossible to proceed with the trial without injustice to the defendant. "As we have often said, an accused is entitled to a fair trial, not a perfect one." *State v. Murdock*, 236 Kan. 146, 154,

689 P.2d 814 (1984). The improper statement did not deny Humphery of a fair trial.

## III. INFORMANT AND ACCOMPLICE CAUTIONARY INSTRUCTIONS

Humphery acknowledges that he did not request an informant and accomplice cautionary instruction and did not object to the instructions given by the trial court. When a defendant does not request a jury instruction or fails to object to the jury instructions, this court's standard of review is

"prescribed by statute. Neither K.S.A. 60-251(b) nor K.S.A. 22-3414(3) permits a party that has failed to request an instruction or to object to the lack of one to assign as error the failure to give an instruction, unless the failure to instruct is clearly erroneous. Giving an instruction or failing to give an instruction is clearly erroneous only if the reviewing court reaches a firm conviction that if the trial error had not occurred, there is a real possibility the jury would have returned a different verdict. [Citations omitted.]" *State v. Harris*, 266 Kan. 270, 277, 970 P.2d 519 (1998).

Humphery now argues on appeal that where the testimony of an accomplice or government informant is not substantially corroborated and is the main basis for a defendant's conviction, the absence of a cautionary instruction is error, even in the absence of a request for the instruction or an objection to the instructions as a whole.

PIK Crim. 3d 52.18 provides for the "testimony of an accomplice" and states that "[a]n accomplice witness is one who testifies that (he)(she) was involved in the commission of the crime with which the defendant is charged. You should consider with caution the testimony of an accomplice." Further, PIK Crim. 3d 52.18-A provides the pattern instruction for "testimony of an informant— for benefits." It states that "[y]ou should consider with caution the testimony of an informant who, in exchange for benefits from the State, acts as an agent for the State in obtaining evidence against a defendant, if that testimony is not supported by other evidence."

Simmons does not fit the definition of an accomplice or an informant. The entire basis of her testimony was that she had sex with Sedore and directed him to drive to 815 Troup, but she was not involved in the robbery or the murder in any way. Some of the

evidence presented at trial could sustain the inference that Simmons was involved in the crime, but she is not an accomplice as contemplated by the jury instruction on accomplices. Likewise, she was clearly not an informant. No evidence was presented that she testified in exchange for benefits from the State. The State did not charge Simmons with a lesser charge or drop charges against her in exchange for her testimony against Humphery, and she did not act as an agent for the State by obtaining evidence against Humphery. Further, it cannot be said that Simmons or Kelsey were accomplices under a conspiracy theory because there was no evidence of a conspiracy.

In *State v. Noriega*, 261 Kan. 440, 932 P.2d 940 (1997), *disapproved on other grounds State v. Mathenia*, 262 Kan. 890, 942 P.2d 624 (1997), the defendant claimed the trial court erred by failing to give cautionary instructions regarding accomplice and paid informant testimony with respect to the testimony of two witnesses. The *Noriega* court held:

"PIK Crim. 3d 52.18 defines an accomplice as one who testifies that he or she was involved in the commission of the crime with which the defendant is charged. Noriega's argument that an accomplice instruction was required fails as there was no testimony that either [witness] acted as accomplices in the murder, aggravated burglary, or aggravated robbery charged." 261 Kan. at 447.

The *Noriega* court stated:

"An informant is an 'undisclosed person who confidentially discloses material information of a law violation, thereby supplying a lead to officers for their investigation of a crime. [Citation omitted.] This does not include persons who supply information only after being interviewed by police officers, or who give information as witnesses during the course of investigation.' Black's Law Dictionary 780 (6th ed. 1990)." 261 Kan. at 448.

Humphery contends that *Noriega* was incorrectly decided and improperly requires a witness to testify that he or she was involved in a crime before an accomplice instruction is required. We decline to overrule our decision in *Noriega* based on Humphery's argument that the accomplice instruction allows a self-serving criminal who has already avoided liability to avoid "liability for the offense in the eyes of the State by providing testimony." Simmons and Kelsey both supplied information after being interviewed by the

police. Likewise, they both gave information as witnesses during the course of the investigation. They were not informants.

## IV. CUMULATIVE ERROR

In *State v. Lumbrera*, 252 Kan. 54, Syl. ¶ 1, 845 P.2d 609 (1992), the court provided the standard of appellate review regarding cumulative error:

"Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant."

Some of the witnesses who testified for the State would not be characterized as model citizens. This, however, does not mean the jury could not find their testimony credible in whole or in part. The jury viewed the witnesses, had the opportunity to assess their credibility, or lack thereof, and reached a reasonable verdict based upon the evidence presented to it.

We have addressed each error raised by Humphery and have concluded that either no error occurred or that no prejudice was established. We have also considered the cumulative effect any of the errors might have had on Humphery's right to a fair trial and conclude that under the totality of the circumstances, Humphery's right to a fair trial was not impaired and reversal of the conviction is not warranted.

Affirmed.