86,782

STATE OF KANSAS, *Appellee*, v. LISA BOLDRIDGE, *Appellant*.
(57 P.3d 8)

Opinion filed November 1, 2002.

*Mary Curtis*, assistant appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, was with her on the brief for appellant.

*Rex L. Lane*, special prosecutor, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Lisa Boldridge appeals her first-degree premeditated murder conviction and hard 50 sentence. She advances the following contentions in this appeal: (1) The trial court violated her rights under the Fifth Amendment to the United States Constitution by admitting into evidence at trial her statements made to police, (2) the trial court erred by admitting certain hearsay statements, (3) the State failed to present sufficient evidence to support the imposition of the hard 50 sentence, and (4) the imposition of the hard 50 sentence violates the Sixth and Fourteenth Amendments to the United States Constitution as interpreted in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 St. Ct. 2348 (2000). We affirm.

Following a bench trial, Lisa Boldridge was convicted of the first-degree murder of her former husband, Kurt Boldridge. The State presented evidence that Lisa and three men, John Goodpasture, Gary Skeen, and Kirk Wilson, went to Kurt's house where Wilson shot Kurt in the head while he was sleeping. The sentencing court found that the crime was motivated by financial gain, found that there were no mitigating circumstances, and imposed the hard 50 sentence upon Lisa.

In return for a reduced charge, John Goodpasture agreed to testify for the State. Goodpasture first saw Lisa on March 18, 2000, while drinking beer at a house with his friends, Harold Gillis and Skeen. According to Goodpasture, Lisa arrived sometime between 10 p.m. and 2 a.m. and announced that she wanted to kill Kurt. Lisa left with Goodpasture, and Wilson and Skeen followed. She drove to Kurt's house and let the others inside. Lisa obtained a shotgun for Wilson who, followed by Lisa, approached Kurt sleeping in his bed. Wilson brought the weapon within 16 inches of

Kurt's head and fired. The three men stayed for approximately 10 minutes looking for cocaine but left when there was none to be found. Lisa remained at the house. She eventually met Goodpasture, Skeen, and Wilson at the river, where Wilson threw the shotgun into the river.

On March 24, 2000, Kurt's mother, Sophia Boldridge, contacted the sheriff asking that someone be sent to check on Kurt. Edward LaBarbera, a sheriff's deputy, arrived at Kurt's house at 10:47 a.m. and found the house locked. Deputy LaBarbera noticed an odor he believed to be a dead body and also noticed flies swarming. Another sheriff's deputy, Jason Wohlgemuth, arrived shortly thereafter. The doors and windows were locked, but Deputy Wohlgemuth found a window that was broken and climbed through to let Deputy LaBarbera in the house. While in the house, Deputy Wohlgemuth also noticed the odor. Deputies Wohlgemuth and LaBarbera moved through the house until they reached the master bedroom where they found Kurt's fully covered body. Deputy Wohlgemuth pulled the comforter from Kurt's body, exposing Kurt's shoulders and arms. He could not determine the cause of death based on viewing Kurt's body but told Sophia Boldridge that her son was dead and that it was apparent that he had been dead for some time.

Sheriff John Calhoon testified that when he went through Kurt's house with the coroner, he immediately identified Kurt's body but could see no wounds because it was badly deteriorated.

That same day, another search was made by agents of the Kansas Bureau of Investigation (KBI). Special Agent Timothy Dennis entered Kurt's house shortly after 4 p.m. The cause of Kurt's death was unknown at this time, and Dennis believed he was investigating an unattended death. There were no signs of a struggle in the bedroom. Dennis then observed a gunshot wound to the left side of Kurt's head which he believed to be either a contact wound or a near contact wound. Dennis noticed a small amount of blood splatter on the headboard, which indicated the body had been shot in that location. He also noticed a piece of shotgun wadding which was burrowed under the comforter, indicating the comforter was placed on the bed after the shooting. It was not until 5:45 p.m. that

Dennis emerged from Kurt's house and announced that the cause of death was known.

Rosetta Birch, a hospital employee who works with Lisa's sister, Rhonda Turpin, testified at trial that Lisa called the hospital between 2 and 2:20 p.m. the same day Kurt's body was found, asking to speak with Turpin. According to Birch, Turpin was not available to take the call. Birch testified that Lisa told her that Kurt had been found dead with a gunshot wound. Lisa asked Birch to tell Turpin to call her, and Birch delivered that message to Turpin.

According to Billie Whitfield, a hospital employee who worked with Birch and Turpin, Turpin also had a telephone conversation that day with Lisa and learned that "they had found Kurt Boldridge dead." When asked by the prosecutor about the cause of death, Whitfield testified she learned from Turpin that "[Kurt had] been shot in the back of the head." Whitfield testified her conversation with Turpin occurred at 2:20 p.m. on March 24.

On March 28, 2000, Deputy Wohlgemuth visited Lisa to obtain a voluntary consent to search her residence. While there, Lisa gave Wohlgemuth a letter from the Social Security Administration (SSA) dated March 17, 2000, and postmarked the same day.

The State presented the testimony of Pam Langan, another of Lisa's coworkers. Prior to Kurt's death, Lisa had complained about Kurt not paying child support and about times when Kurt had abused their son, A.B. Langan testified Lisa made the following prediction prior to the discovery of Kurt's body: "She told me the Monday morning before Kurt was found, that Kurt had slapped [A.B.] around over the weekend and it would be the last time that he ever touched him. And she said, I guarantee it will be the last time he ever touches him." Further, Langan testified Lisa believed Kurt would be better off dead: "And [Lisa] made the comment that the best thing that could happen for [A.B.] is if Kurt ended up dead so [A.B.] could collect his social security."

The State also presented the deposition testimony of Veronica Henderson, an SSA employee. Henderson testified that Lisa telephoned on March 17, 2000, inquiring about death benefits for A.B. Lisa told Henderson the date of Kurt's death was March 14, 2000. A record of the telephone call was generated by the SSA

computer and substantiated Henderson's testimony. Henderson testified Lisa acted nervous and apprehensive.

The court found Lisa guilty of premeditated murder as an aider and abetter and sentenced her to life imprisonment without parole for 50 years pursuant to K.S.A. 2001 Supp. 21-4638.

(1) *Admission of Lisa Boldridge's Statements*

The standard of review of a trial court's determination where an inquiry on the admissibility of a defendant's statement was conducted and the statement was admitted, is narrow. The trial court's ruling will be accepted on appeal if it is supported by substantial competent evidence. In this case, the trial court determined after a hearing that all the defendant's statements were admissible, and our inquiry is thus limited to whether the determinations were supported by substantial competent evidence. See *State v. Minor,* 268 Kan. 292, 297, 997 P.2d 648 (2000).

"*Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), holds that the State may not use statements stemming from a custodial interrogation of a defendant unless the State demonstrates the use of procedural safeguards to secure the defendant's privilege against self-incrimination. [Citation omitted.] However, an officer's obligation to administer a *Miranda* warning attaches only where there has been such a restriction on the suspect's freedom so as to render him or her in custody. [Citation omitted.]" *State v. Heath,* 264 Kan. 557, 590, 957 P.2d 449 (1998).

A waiver of *Miranda* rights must be knowing, voluntary, and intelligent under the totality of the circumstances, and the burden of proving a voluntary waiver of rights is on the State. *State v. Hedges,* 269 Kan. 895, 908, 8 P.3d 1259 (2000). However, a waiver of *Miranda* rights need not be in writing. *State v. Crume,* 271 Kan. 87, 97, 22 P.3d 1057 (2001).

Lisa called into question the interviews which took place March 27, 2000; March 29, 2000; April 4, 2000; June 29, 2000; and one interview after June 29, 2000.

On March 27, 2000, Lisa met with KBI Special Agents Johnson and Morgan and sheriff's investigator Larry Myer at the courthouse. Johnson read Lisa her *Miranda* rights, and Lisa waived those rights. Lisa understood her rights. Lisa was not in custody

and came in voluntarily for the interview. Lisa was not "constrained of her liberty in any significant matter" and could have left had she wanted to, which she understood because Johnson told her so.

The second interview took place at the courthouse March 29, 2000. Again, Lisa voluntarily arrived at the courthouse, was not in custody, and was free to go at all times. Johnson read Lisa her *Miranda* rights out loud, and she signed a form indicating that she understood her rights and voluntarily waived them.

The third interview took place at the courthouse April 4, 2000. The same procedure was implemented to inform Lisa of her rights, culminating in her having initialed the statement to signify she understood the rights and wished to waive them again.

The fourth interview took place at the courthouse the evening of June 29, 2000. Lisa was scheduled to appear on her own but did not do so. Johnson and Myer went to track her down. It is not clear from the record how Lisa made it to the courthouse, *i.e.,* whether in her own car or with Johnson and Myer. At the courthouse, Lisa herself read out loud the *Miranda* rights. Johnson described the circumstances:

"I had the form out. She took the form. She read the rights out loud to me. She said she understood them. And she then agreed to talk to me. I didn't sign it because I was just going to do a verbal. You know, you can do it either way. That one I was just going to do a verbal advisement. But she took the form. She read it out loud, acknowledged that she understood, said she didn't want an attorney, and agreed to talk to me."

It was Johnson's opinion that Lisa understood the procedure by that time. Lisa was arrested following the June 29, 2000, interview. She did not want to talk after the arrest.

The fifth occasion occurred while Myer was transporting Lisa from Atchison County to Leavenworth for a hearing. Myer did not ask Lisa any questions during this time. Lisa asked to speak with Johnson, and he eventually was summoned to speak with her. Johnson explained the encounter:

"And she was incarcerated in Leavenworth in the old county jail because they hadn't moved into the new one yet. She was in a room. I walked in there. As soon as I walked in the door, she started talking. So I did not have a rights advisement on that one. But there was nothing of any interest said, anyway."

The trial court found Lisa made a proper waiver of her Fifth Amendment rights before the interviews March 27, March 29, and April 4. Further, the court found Lisa was not in custody during the March 27 and March 29 interviews. On appeal, Lisa implicitly acknowledged these first three interviews posed no concern, and we find no constitutional infirmities with using testimony based upon these interviews.

Regarding the June 29 interview, the court found Lisa waived her Fifth Amendment rights, although she did not do so in writing. The court also found that Lisa initiated the June 29 interview. With regard to the last interview, the court found Lisa's statements were not the result of a law enforcement interrogation, as Lisa had initiated the conversation.

With respect to the June 29 interview and the last interview, Lisa in her brief and argument before this court pointed out confusion in the court's ruling and concluded that "the trial court did not realize that the fourth [June 29] interrogation, after which Lisa was arrested, was distinct from the fifth, in which she requested an interview with Special Agent Johnson." The court said the June 29 interview was initiated by Lisa despite the testimony indicating that it was the last interview which she initiated. However, it is also clear the court understood separate instances were at issue. The trial court found Lisa also waived her rights before beginning the June 29 interview. With respect to the last interview, the court found that Lisa initiated the conversation, which was "not a result of any interrogation or any questioning by law enforcement."

Lisa argued further with respect to the June 29 interview that it was error to admit her statements because she did not "sign anything indicating that she wanted to waive her rights." However, a defendant in a custodial interrogation need not explicitly waive his or her right to counsel. *State v. Jackson,* 226 Kan. 302, 305, 597 P.2d 255 (1979), *cert. denied* 445 U.S. 952 (2000). In this case, Lisa read the rights, said she understood them, and agreed to speak without the benefit of counsel. There is no evidence in the record to dispute these findings.

Lisa's rights were similarly not violated during the last interview which occurred with Johnson after her arrest. "An accused may waive *Miranda* rights by his or her own acts and words in initiating conversation with police." *State v. Groschang*, 272 Kan. 652, Syl. ¶ 4, 36 P.3d 231 (2001). Lisa requested the meeting and began talking as soon as Johnson walked into the room. Lisa initiated the conversation and began talking before Johnson could speak. There is nothing in the record to contradict these facts. We conclude that the admission of all statements is supported by substantial competent evidence.

(2) *Admission of Hearsay Statements*

Lisa argued the trial court erred in admitting the testimony of Billie Whitfield that included multiple hearsay. The State presented the testimony of Whitfield, who testified about statements made by Lisa's sister, Rhonda Turpin, regarding Turpin's conversation with Lisa. Whitfield testified Turpin spoke with Lisa, who told Turpin, before law enforcement officers had announced that Kurt's death was a homicide, that Kurt had been killed by a shot to the back of the head. Lisa lodged contemporaneous objections to any statements made by Turpin on the basis that the statements were inadmissible hearsay.

The admission or exclusion of hearsay evidence is within the sound discretion of the trial court. *State v. Humphery*, 267 Kan. 45, 55, 978 P.2d 264 (1999).

This issue involves one of multiple hearsay in that it comprises (1) the statement made by Lisa to Turpin on the telephone and (2) the statement made by Turpin to Whitfield about what Lisa said in that conversation. K.S.A. 60-463 governs the admission of multiple hearsay: "A statement within the scope of an exception to K.S.A. 60-460 shall not be inadmissible on the ground that it includes a statement made by *another declarant* and is offered to prove the truth of the included statement if such *included statement* itself meets the requirements of an exception." (Emphasis added.)

In analyzing this issue within the context of 60-460 and 60-463, we first deal with the included statement made by another declar-

ant. Lisa is the other declarant and her statement that the victim was shot in the back of the head is the included statement sought to be admitted. On appeal, Lisa conceded her own statement would be admissible as an admission by parties. See K.S.A. 2001 Supp. 60-460(g) ("As against a party, a statement by the person who is the party to the action in the person's individual or a representative capacity and, if the latter, who was acting in such representative capacity in making the statement."). Thus, under K.S.A. 60-463, the "included statement itself meets the requirements of an exception" under K.S.A. 2001 Supp. 60-460(g). However, Lisa argued that Turpin's statements to Whitfield could not meet those exceptions.

The question under K.S.A. 60-463 is whether Whitfield's testimony about what Turpin said is "[a] statement within the scope of an exception to K.S.A. 60-460." The trial court ruled that it was admissible under 60-460(d)(2) as an excited utterance. Thus, according to the trial court's ruling, Turpin's statement to Whitfield was made "while the declarant [Turpin] was under the stress of a nervous excitement caused by such perception"; that is, Turpin was under the stress of a nervous excitement caused by learning of the death of Kurt by a gunshot wound. Thus, according to the trial court, Whitfield's testimony about what the declarant said constitutes a statement within the scope of an exception to the hearsay rule, more specifically 60-460(d)(2). This statement is not inadmissible on the ground that it includes a statement made by another declarant (Lisa) and is offered to prove the truth of the included statement if such included statement (Lisa's) itself meets the requirements of an exception. Lisa's statement fits the exception in K.S.A. 2001 Supp. 60-460(g), as a statement against interest. The requirements of K.S.A. 60-463 are, therefore, satisfied.

In *State v. Rowe*, 252 Kan. 243, 250, 843 P.2d 714 (1992), we discussed the excited utterance exception and, citing Barbara, Kansas Evidence Objections with Evidentiary Foundations, § 7.6, pp. 7-18 (1988), we analyzed the exception according to the following four elements:

" '1. An event or condition occurred.
" '2. It was startlingly sufficient to cause nervous excitement.

" '3. The declarant perceived it.
" '4. The declarant made the statement while under stress of nervous excitement.' [Citation omitted.]"

The excited utterance exception has the " 'characteristic of spontaneity arising either from the reaction to contemporary perception or from the excitement which carries over from the event.' " 252 Kan. at 248-49 (quoting 1 Gards Kansas C. Civ. Prac. 2d Annot. § 60-460[d], p. 239 [1979]).

In terms of the above elements, the following facts must be true to make Whitfield's testimony as to Turpin's statements admissible: First, an "event" must have occurred when Lisa called Turpin and spoke to Turpin on the telephone. Second, Lisa's having broken the news to Turpin over the telephone must have caused Turpin nervous excitement. Third, Turpin must have perceived the event. Last, Turpin must have made the statement that Whitfield relates in court under stress of nervous excitement.

This court most recently visited the 60-460(d)(2) hearsay exception in *State v. Bryant*, 272 Kan. 1204, 38 P.3d 661 (2002). Bryant, the defendant, was convicted of three counts of first-degree premeditated murder. After the murder in Wichita, Bryant and his coconspirator, Pink, returned to Pink's house in Arkansas City, and Pink's wife overheard Pink ask Bryant why he killed the victims. At trial, the State introduced Pink's statement through Pink's wife. On appeal, Bryant argued the trial court erred in admitting the hearsay statements of his coconspirator through the wife of his coconspirator. This court disagreed and found the statement was properly admissible under the excited utterance exception, 60-460(d)(2):

"The 'excited utterance' exception under K.S.A. 60-460(d)(2) allows a hearsay statement to be introduced to prove the truth of the matter when the statement was made under the stress of nervous excitement caused by such perception. Such are the facts in this case because of the emotional state of Malcolm Pink and the close time frame to the triple homicide. The requirements that the event or condition occurred, that it was sufficiently 'startling' to show that the declarant perceived it, and the declarant made the statement while under stress of nervous excitement were recognized in *State v. Rowe*, 252 Kan. 243, 250, 843 P.2d 714 (1992). See Barbara, Kansas Rules of Evidence with Evidentiary Objections and Evidentiary Foundations, § 7.6 (3d ed. 1993)." 272 Kan. at 1209.

*Bryant* notes that reliability can be inferred when hearsay statements are admitted under the excited utterance exception, but such hearsay statements might be excluded if reliability is found not to exist. 272 Kan. 1209-10, Syl. ¶ 5.

In *Bryant,* Pink was the declarant, and Pink's wife was the witness. The court found Pink's statement admissible because it was made relatively contemporaneous with the startling event, the triple homicide. Thus, from *Bryant,* it is clear that it is the emotional state of the declarant that should be examined.

The two real issues in this case are (1) whether the news relayed to Turpin by Lisa that Kurt had been shot in the back of the head was sufficiently startling to Turpin and (2) whether Turpin made the statements to Whitfield while under the stress of nervous excitement caused by the startling event. Lisa argued that only incidents such as a murder or an accident are sufficiently startling to invoke the excited utterance exception. Lisa cites *State v. Walker,* 28 Kan. App. 2d 700, 20 P.3d 1269 (2001). However, in *Walker,* there was no evidence of the declarant being startled, and even the defendant, who offered the declarant's statement, withdrew his offer under 60-460(d)(2) and claimed the statement was admissible under another exception—the general necessity/present sense exception. 28 Kan. App. 2d at 705.

The record demonstrates that the prosecutor attempted to lay a foundation for admission of Turpin's statement as an excited utterance under K.S.A. 2001 Supp. 60-460(d)(2). Whitfield testified that rather than her usual "boisterous and talkative" demeanor, Turpin appeared "[q]uiet and reserved" following the telephone conversation. The prosecutor continued to probe Whitfield about Turpin's demeanor:

"Q. In fact, you were interviewed by law enforcement within about a day after this incident, were you not?
"A. Yes.
"Q. Do you recall how you described her to them?
"A. Probably as shocked.
"Q. Do you feel that she was in some kind of state of shock at that time?
"A. Yes, after what she had told me."

The question of whether the news of Kurt's death was information capable of producing sufficient "stress of a nervous excite-

ment" is one that must be resolved by the trial court. Here, the trial court determined that the information was not only capable of doing so but that the declarant (Turpin) was under the stress of a nervous excitement caused by hearing the information. These determinations are reviewed under an abuse of discretion standard, and we conclude that no abuse of discretion has been demonstrated. Moreover, there is support for application of the excited utterance exception to a person's statements made after hearing of the death of someone. See *Pugh v. Commonwealth,* 223 Va. 663, 292 S.E.2d 339 (1982) (finding a father's statement of "Oh, no, not again," made after learning of his daughter's death, was prompted by sufficiently startling circumstances to qualify for the excited utterance exception).

One further matter must be considered regarding the admissibility of Whitfield's statement. The United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. 6. In *Ohio v. Roberts,* 448 U.S. 56, 66, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980), the Court said:

"[W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception."

The Court later determined that a showing of unavailability of the declarant was not necessary under the excited utterance hearsay exception. *White v. Illinois,* 502 U.S. 346, 356-57, 116 L. Ed. 2d 848, 112 S. Ct. 736 (1992). Recently this court in *State v. Deal,* 271 Kan. 483, 500, 23 P.3d 840 (2001), held that the excited utterance exception under 60-460(d) is a firmly rooted hearsay exception; reliability may be inferred without any further showing. Thus, admission of Whitfield's statement did not violate Lisa's right of confrontation under the United States Constitution.

Finally, we note that the testimony of Whitfield concerning Lisa's knowledge of the victim's death by gunshot to the back of the head before that information was public knowledge was admitted into evidence by two other witnesses.

Rosetta Birch also worked at the local hospital with Turpin. Birch had a telephone conversation with Lisa that same afternoon before Lisa spoke with her sister, Turpin. In that conversation Lisa told Birch that Kurt had been found dead with a gunshot wound. Birch testified to the contents of this telephone conversation at trial. Lisa also spoke by telephone with an employee of the SSA, Veronica Henderson. Henderson testified that Lisa called the SSA on March 17 to inquire about death benefits for her son, A.B. Thus, the State established, either with or without Turpin's hearsay statements, that Lisa knew about Kurt's death before the law enforcement authorities.

If we were to conclude that Whitfield's testimony was inadmissible hearsay, the error would be harmless, providing no grounds for reversal of Lisa's conviction.

"Error in the admission or exclusion of evidence in violation of a constitutional or statutory right of a party is governed by the federal constitutional error rule. An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that the error is harmless. Before an appellate court may declare such an error harmless, the court must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. Where the evidence of guilt is of such direct and overwhelming nature that it can be said that evidence erroneously admitted or excluded in violation of a constitutional or statutory right could not have affected the result of the trial, such admission or exclusion is harmless. [Citation omitted.]" *State v. Sanders*, 258 Kan. 409, 418-19, 904 P.2d 951 (1995).

(3) *Sufficiency of Evidence to Support Imposition of the Hard 50*

The standard of review where the sufficiency of the evidence is challenged for establishing the existence of an aggravating circumstance in a hard 50 sentencing proceeding is "whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance by a preponderance of the evidence." *State v. Brown*, 272 Kan. 809, Syl. ¶ 2, 37 P.3d 31 (2001); *State v. Murillo*, 269 Kan. 281, 287-88, 7 P.3d 264 (2000). The following standard is applied regarding mitigating circumstance:

"Where the trial court's refusal to find a mitigating circumstance under K.S.A. 21-4637 is challenged by the defendant, the standard of review is whether, after a review of all the evidence, viewed in a light most favorable to the defendant, a rational factfinder could have found by a preponderance of the evidence the existence of the mitigating circumstance." *State v. Livingston,* 272 Kan. 853, 858, 35 P.3d 918 (2002).

Where there is a question involving the sentencing court's weighing of the aggravating and mitigating circumstances, its ultimate determination will not be disturbed absent an abuse of discretion. *State v. Spain,* 269 Kan. 54, 60, 4 P.3d 621 (2000).

The trial court found that Lisa committed the crime for herself or another for the purpose of receiving money or any other thing of monetary value, an aggravating circumstance under K.S.A. 2001 Supp. 21-4636(c). The court also rejected Lisa's argument that the mitigating factors in K.S.A. 21-4637(d) and (h) existed and outweighed any aggravating factors found.

### Aggravating Factor

Lisa argues that in contrast to a number of this court's prior decisions on the financial gain aggravating factor, the evidence was mere speculation. Lisa admits that she called the SSA office but maintains the call was placed after she heard Wilson talk about killing Kurt. Further, Lisa points out that she would not stand to gain from Kurt's death, although the statute clearly does not require that the financial gain go to the defendant. See K.S.A. 2001 Supp. 21-4636(c).

There is sufficient evidence in the record to support the sentencing court's finding that Lisa's motive for the crime was financial gain. Lisa was concerned with her son's financial support. Langan, who worked with Lisa, testified about Lisa's concern and as to Lisa's statements that the best thing that could happen would be for Kurt to be dead. Not only would the physical abuse cease, but A.B. would receive financial support through Kurt's social security benefits. A letter was found upon the search of Lisa's residence answering her inquiries concerning social security benefits available for A.B. upon Kurt's death. Lisa made a call soon after Kurt's death informing the SSA of Kurt's death so that payments to her

son could be initiated. That Lisa killed Kurt to benefit her son with social security death benefits is established in trial testimony.

Lisa argued that her actions do not rise to the level of financial motive established in other cases. Specifically, Lisa argued the evidence of financial gain was mere speculation. The evidence in this case is not mere speculation. We conclude that evidence established that the defendant committed the crime for another, A.B. for the purpose of receiving money or any other thing of monetary value, and so was a proper aggravating circumstance in accordance with 21-4636(c).

### Mitigating Circumstances

Lisa argued that the sentencing court erred in failing to consider the mitigating circumstances of her minor role in the crime and the history of abuse by Kurt. In making this argument, Lisa relied upon the provisions of K.S.A. 21-4637:

"Mitigating circumstances shall include, but are not limited to, the following:

. . . .

"(d) The defendant was an accomplice in the crime committed by another person, and the defendant's participation was relatively minor.

. . . .

"(h) At the time of the crime, the defendant was suffering from posttraumatic stress syndrome caused by violence or abuse by the victim."

The trial court found that Lisa did not play a minor role in the crime as required in K.S.A. 21-4637(d). That subsection requires both that the defendant is an accomplice and that the defendant's participation is relatively minor. In support of the decision, the sentencing court made the following findings:

"The Court finds—and found—from the evidence that the defendant essentially allowed access to the victim's house, provided the gun that was the murder weapon, and also ammunition.

"The Court cannot characterize those acts as being relatively minor.

"And the Court considers those to be very major acts.

"As I stated at the time the Court rendered its decision, I see very little difference between pulling the trigger and handing the gun to the person who pulls the trigger.

"I cannot characterize the actions of the defendant in this case as being minor, even though that she was technically an aider and abettor."

Lisa offered no credible arguments to show the sentencing court's finding under the applicable standard of review was in error.

*State v. Conley*, 270 Kan. 18, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001), affirmed the negative finding that the defendant in that case did not play a minor role in the crime, although someone other than the defendant probably fired the fatal shot to the victim's forehead. 270 Kan. at 30. The evidence established that Lisa recruited the killer, led him to the victim's house, obtained the shotgun, and led the killer to the bedside of the victim. We agree with the trial court's conclusion that in this case, there is "very little difference between pulling the trigger and handing the gun to the person who pulls the trigger."

The State's evidence in the present case precludes a finding that Lisa's role was minor. Lisa announced to Wilson, Skeen, and Goodpasture that she wanted to kill her husband. Lisa showed these men the way to Kurt's house. Lisa let the men in Kurt's house and found a shotgun for Wilson to use. When Wilson fired the gun, Lisa had been standing behind Wilson the entire time. When the murder is committed with a shotgun, *i.e.,* only one shot to the head is necessary to complete the act, it is difficult to imagine how Lisa could have played a more active role in Kurt's death without pulling the trigger herself.

After review of all the evidence, viewed in the light most favorable to the defendant, we determine a rational factfinder could not have found by a preponderance of the evidence that Lisa played a minor role in Kurt's death.

Lisa also argued there was sufficient evidence she suffered from posttraumatic stress syndrome caused by violence or abuse by the victim pursuant to K.S.A. 21-4637(h). While the record suggests a discordant relationship between the victim and Lisa, Lisa failed to present evidence that she suffered from posttraumatic stress syndrome.

### Weighing Equation

Our conclusion that the trial court's finding of the aggravating factor of financial gain is supported in the record and our further conclusion that the trial court's determination that the claimed mit-

igating circumstances did not exist demonstrates that the trial court's weighing of all factors and its imposition of the hard 50 sentence was not an abuse of discretion.

(4) *Apprendi v. New Jersey and the Hard 50 Sentence*

Lisa challenges the constitutionality of the judge-imposed hard 50 sentence, arguing the sentence violates the principles set forth in *Apprendi v. New Jersey,* 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). Lisa cites *Ring v. Arizona,* 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002).

Imposition of the hard 50 sentence based on a fact not found by the trial court as factfinder in a bench trial or by a jury in a jury trial does not increase a defendant's maximum sentence of imprisonment for life. The hard 50 sentence limits the lower end of the sentence. A defendant's hard 50 sentence violates neither the Due Process Clause of the United States Constitution nor his or her right to trial by jury under the Sixth Amendment of the United States Constitution or Section 5 of the Kansas Constitution Bill of Rights.

This same argument has been rejected by this court in *State v. Douglas,* 274 Kan. 96, 111-12, 49 P.3d 446 (2002). See *State v. Conley,* 270 Kan. 18, 11 P.3d 1147 (2000); see also *State v. Boorigie,* 273 Kan. 18, 41 P.3d 764 (2002) (summarily incorporating the *Conley* analysis with respect to *Apprendi* and the imposition of the hard 40 sentence). Lisa fails to cite any additional authority for this court to alter its position.

Affirmed.

LARSON, S.J., assigned.