No. 90,319

STATE OF KANSAS, *Appellee,* v. JOSHUA JAMES ROBERTSON,
*Appellant.*
109 P.3d 1174

Opinion filed April 22, 2005.

*Mary Curtis,* assistant appellate defender, was on the brief for appellant.

*Jan L. Satterfield,* county attorney, argued the cause, and *Phill Kline,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Joshua Robertson was convicted of first-degree murder, arson, and aggravated burglary in the killing of Patricia Self and the burning of her home. He received a hard 50 life sentence. He appeals his first-degree murder conviction and sentence.

Robertson raises seven issues before this court: (1) Did the district court err in overruling his motion to suppress his statements to law enforcement? (2) Did the prosecutor commit reversible misconduct during closing argument? (3) Was the evidence sufficient to prove first-degree premeditated murder? (4) Should the district court have instructed the jury on voluntary manslaughter? (5) Did cumulative errors deny defendant a fair trial? (6) Was the evidence

sufficient to support a hard 50 sentence? and (7) Is the hard 50 sentencing statute constitutional?

*Facts*

This case began when Roger and Patricia Self's home in Augusta burned, and fire investigators discovered human remains inside. Roger Self was located at his place of employment, but the whereabouts of his wife, Patricia, and the Selfs' adult daughter, Jennifer, who was living with the Selfs, were not immediately known. Because authorities could not make a positive identification of the remains, Officer Drew Reed was dispatched to locate Jennifer and her boyfriend, defendant Robertson.

Jennifer and Robertson had been dating approximately 1 month before the fire, and Roger described Jennifer as obsessed with the relationship, despite his and his wife's disapproval. Robertson had been permitted to stay the night at the Selfs' home on a couple of occasions earlier in the relationship, but he was no longer welcome to visit after Roger caught him in the same bed with Jennifer.

About 1 week before the fire, Jennifer argued with her parents about letting defendant visit their home again. She became violent and used a small knife to stab books and magazines in her room. Roger took the knife away and hid all of the knives in the house. He was frightened because Jennifer had tried to cut her wrists in the past. The Selfs did not see Jennifer for a couple of days leading up to the fire.

Robertson had been living with his grandparents, where he and Jennifer sometimes spent the night. Also approximately 1 week before the fire, defendant's grandmother called Patricia to tell her that she had overheard a disturbing conversation between Robertson and Jennifer. Robertson had said "something about making [Jennifer's] parents disappear."

The day before the murder, Patricia made homemade bread, and Roger retrieved a serrated bread knife from its hiding place for her to use. They did not rehide the knife after using it; but, before going to bed, Roger made sure that all of the doors and windows of the home were locked. Jennifer did not have a key.

At approximately 3:30 on the morning of the murder, Robertson and Jennifer walked to the Selfs' home. They arrived about 5 a.m., shortly after Roger left for work. They had a box cutter and a pocket knife with them and cut the telephone line. After they were unable to enter the house through a window, Jennifer knocked on the door. Her mother answered, and Jennifer rushed inside and started cutting Patricia with a knife. Robertson followed Jennifer, and he and Jennifer got Patricia into a chair and stabbed her. Jennifer retrieved the bread knife from the kitchen and began to stab her mother with it. Robertson described his and Jennifer's actions as "slice, slice, slice; stab, stab, stab."

At some point during the attack, Robertson's left hand was cut. While he and Jennifer attended to his hand, Patricia attempted to escape by crawling toward the front door. Robertson and Jennifer each grabbed one of Patricia's legs and pulled her toward the middle of the living room. Patricia was then lying on her back, making gurgling noises. Robertson and Jennifer stomped on her neck and face until she stopped.

The attack left blood everywhere, according to Robertson. He took a shower, and Jennifer cleaned his boots. Then they placed his bloody clothes on the couch and doused it with alcohol. They took a credit card from Patricia's purse, lit the couch on fire, and left.

Fire investigators later concluded the fire in the Selfs' home was set intentionally with a flammable liquid or accelerant. The bread knife was found under Patricia's hips. The pocket knife was found under the remains of clothing. The box cutter also was found in the debris.

A forensic pathologist testified at Robertson's trial that she was unable to make an accurate external examination of all of the injuries Patricia suffered because of the severity of her burns. However, the pathologist was able to detect some injuries and to determine that Patricia had died before the fire was started. The pathologist noted that Patricia suffered several fractures to her face and at the base of her brain. She also endured a blunt force injury to the back of her head, consistent with the head hitting a firm surface. She suffered multiple stab wounds to the face and neck,

including a wound to her left jugular vein and a wound under her right eyelid across her face and into her brain. Her hyoid bone was fractured; the injury was consistent with "manual strangulation or blunt force injury of the neck." In all, Patricia suffered seven facial fractures, and the pathologist testified that the face and neck fractures could be consistent with stomping or kicking.

On the morning of the murder and fire, immediately upon being detained, Robertson asked Officer Reed if he was under arrest and if he could have a court-appointed lawyer. Reed had not given *Miranda* warnings to Robertson because he had not intended to question him; he was merely responsible for transporting him to the sheriff's department. Reed advised Robertson that he was not under arrest, that he was only being detained for questioning, and that he should talk to interviewing officers about getting a court-appointed attorney.

Robertson was placed in an interrogation room with an activated video recording device. Reed waited in the room with Robertson but did not question him. During a part of the time the two men waited for other investigators to arrive, emergency medical technicians treated Robertson's hand. Robertson made repeated remarks to Reed about his love for Jennifer and her motive for committing the crime. He asked Reed about the case and asked again if he would be appointed an attorney. Robertson also asked what the charges were and what the bond would be. Reed again responded that defendant would have to wait for the interviewing officers to find out more information and that he did not know if there were any charges. Defendant then asked Reed what the bond was for premeditated murder. Reed responded that he did not know.

When investigating officer Kelly Herzet arrived, Reed left. Reed did not tell Herzet that Robertson had requested a court-appointed attorney. Herzet also did not know that the remains had been or would be identified as Patricia.

Before Herzet could ask Robertson his name, Robertson said: "What's the motive? I tried to stop her. She cut my hand through my gloves. What was her motive?" Robertson asked again about a court-appointed attorney and said immediately that Jennifer had

cut the phone line. Herzet interrupted defendant and asked his name, but defendant kept talking. Herzet then pulled out a form so that he could go over the *Miranda* rights with Robertson. Robertson told Herzet that he was not going to sign a waiver and that he wanted a lawyer present. Before Herzet could say anything, Robertson said that his girlfriend had "pulled some stunt" today, that he had gotten cut, and that he was "just an acquaintance, or an accomplice, I don't know." Herzet then said, "We need to talk about that," and Robertson said, "I can't speak until I have an attorney." Herzet responded: "OK."

Robertson then began talking again, remarking that he loved someone "so much." Herzet asked him who he was talking about, and Robertson said "Jennifer." Herzet then said he needed to read the rights form, which would protect Robertson. He also told Robertson that he could mark the form to document that he did not want to talk to law enforcement without an attorney. Herzet specifically said that marking the form would not mean that Robertson had to talk to him. Robertson continued talking despite his expressed intention to wait for an attorney. He told Herzet that he had marked the form to say he would talk but "whether or not I decide to answer certain questions is my decision." Herzet responded, "That is so correct." The form had been signed within 5 minutes of Herzet arriving to talk to defendant.

Herzet then interviewed Robertson for approximately 4 hours. The officer brought Robertson lunch, gave him a soda break, and gave him restroom breaks whenever Robertson needed to do so. Herzet also asked Robertson several times if he needed to go to the hospital for further treatment of his hand, but defendant said he did not need to go. Herzet testified later that Robertson never refused to talk. Sometimes, he would state, "I'll take it up with the Judge," but Herzet understood that Robertson wanted to continue the interview. Robertson ultimately described the crimes, claiming they were primarily Jennifer's fault. He was then arrested.

A third officer, Glenn Hopper, arrived to assist Herzet and to take Robertson to the hospital. Hopper placed Robertson in handcuffs and recited the *Miranda* warnings because Robertson kept saying that he was being charged with first-degree murder. While

en route to the hospital, Robertson kept asking Hopper, "Where is your evidence?" Hopper did not question Robertson. Finally, after being asked repeatedly about evidence, Hopper replied that a body was found at the burned house, and this was the evidence. Robertson then said, "First-degree murder? I was just helping my girlfriend. I was just with my girlfriend." Hopper then gave Robertson the *Miranda* warnings again.

When Hopper and Robertson arrived at the hospital, defendant continued talking and began to yell, repeating, "Where is your evidence?" and saying he was just trying to stop his girlfriend from stabbing her mother. Robertson began adding details to his descriptions, and Hopper again *Mirandized* him. Nurses moved them from waiting room to a treatment room, and Robertson announced to a nurse that he was being charged with first-degree murder. Hopper asked Robertson to refrain from telling the nurse about his charges, and the nurse left; but Robertson continued talking. After a few minutes, he also asked about Jennifer, saying he was afraid she might be blaming him for what happened. Hopper said he was unaware of anything she had said or done. Robertson then asked Hopper if telling Hopper what had happened would help his case. Hopper again advised Robertson of his rights and said he should tell the truth if was going to say anything. Robertson then began to describe the morning's events, but Hopper interrupted, asking him if he wanted to write his statement down. Hopper could not write as fast as Robertson was talking. Robertson agreed to write his statement, which reads:

"Jennifer and I walked to her home. She cut the phone line. She then tryed [*sic*] all the doors to get in to her home. She then knocked on the door, her mom opened it. She rushed her mom with a box cutter. She then went to the kitchen to get a bigger knife. Her mom tryed [*sic*] to crawl out of the house. Jennifer then started stabing [*sic*] her mom, I tryed [*sic*] to take the big knife from Jennifer and got my left hand cut. I then spaced out and stabed [*sic*] her mom 2 or 3 times with the big knife. Her mom was gurgling or chocking [*sic*] on blood. Jennifer then stomped her mom in the face and throat. Her mom stoped [*sic*] gurgling or chocking [*sic*] on blood. Jennifer then told me to stomp her mom, I did not check the pulse before I started to stomp her mom but I think that she was dead when I started to stomp her mom because I did not hear any gurgling or chocking [*sic*] when I started. [Signed,] Josh Robertson."

Robertson moved to suppress his oral statements to Herzet and Hopper and his written statement. The defense argued that Herzet should have walked away as soon as Robertson requested a lawyer without ever giving him the *Miranda* form. In addition, the defense argued that Hopper induced defendant to make a written statement by telling defendant that the truth could help his case.

The district judge denied the motion to suppress. The judge determined that Robertson was in custody at the time he was driven to the police station and that he had made repeated clear and unequivocal requests for an attorney. However, in between those requests, Robertson repeatedly began to talk about the case again: "In one breath, he would say I want a lawyer, in the next breath he would say I tried to stop her. I cut my gloves. She started the fire." The judge also noted that the only person asking questions was Robertson. Any confusion Herzet had about Robertson's intentions was therefore understandable, and he effectively gave the *Miranda* warnings, including a clear statement that he would walk away if Robertson checked the appropriate box to say he did not want to talk. On these facts, the district judge found Robertson voluntarily and freely signed a waiver of his *Miranda* rights, and the interrogation by Herzet did not actually begin until then.

The district judge also found that Hopper had not induced Robertson to make a statement. Robertson had instigated the conversation and asked Hopper if telling the truth would help his case. He had received the *Miranda* warnings numerous times. The making of another statement was at Robertson's suggestion, not Hopper's.

During the instructions conference at trial, Robertson requested an instruction on voluntary manslaughter as a lesser included offense. He asserted that there was sufficient evidence to show that, when Jennifer attacked her mother and cut his hand, an extreme emotional circumstance resulted. The instruction would have read:

"In determining whether the defendant is guilty of murder in the second degree, you should also consider the lesser offense of voluntary manslaughter. Voluntary manslaughter is an intentional killing done (upon a sudden quarrel) (in the heat of passion) (upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of [a person] [a dwelling] [property]).

"If you decide the defendant intentionally killed [Patricia Self], but that it was done (upon a sudden quarrel) (in the heat of passion) (upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of [a person] [a dwelling] [property]), the defendant may be convicted of voluntary manslaughter only." PIK Crim. 3d 56.05.

The district court rejected defendant's request, finding that, if defendant's version were believed, any provocation that existed was solely between Jennifer and her mother; an ordinary person experiencing an extreme emotional reaction would not have begun to participate in Jennifer's crimes. The district judge did instruct on second-degree murder, a voluntary but not premeditated crime. The State requested an instruction setting forth factors from which premeditation may be inferred. This instruction is not included in PIK but the language has been recited in several Kansas cases, including *State v. Pabst*, 268 Kan. 501, 512-13, 996 P.2d 321 (2000), which reads:

"Premeditation may be inferred from various circumstances, including: (1) the nature of the weapon used; (2) the lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; or (5) the dealing of lethal blows after the deceased was felled and rendered helpless."

The district judge rejected the State's request, finding the PIK definition sufficient. The judge agreed the requested instruction was a correct statement of Kansas law and said the State could argue the factors included in the definition during closing. The prosecutor then used an overhead projection of the rejected instruction language during closing and argued that premeditation could be inferred from the circumstances. A defense objection to this procedure was overruled. The district judge noted that the language was merely a paragraph with no instruction number or case citation. Later, when the jury asked for a copy of the language during its deliberations, the judge denied the request, characterizing the language as "simply part of the prosecution's final argument."

After the jury found defendant guilty of first-degree murder, arson, and aggravated burglary, the district judge imposed a hard 50 sentence for the first-degree murder conviction. The judge

found one aggravating factor — that the crime was committed in an especially "heinous, atrocious, or cruel" manner — because Patricia had suffered a long and torturous death and her body and the house had been set on fire. The district judge also noted that Patricia was aware of what was happening because she tried to escape from her attackers. In the district judge's view, the "heinous, atrocious or cruel" finding was supported because there had been infliction of mental anguish or physical abuse before the victim's death; there had been torture of the victim; and acts of violence had begun before or continued after the killing. See K.S.A. 2004 Supp. 21-4636(f)(3), (4), (5).

The defense argued that several mitigating factors applied, but the district judge rejected each. The judge noted Robertson's three prior convictions and found one, a felony conviction for aggravated indecent solicitation of a child, to be significant. The judge also rejected Robertson's contention that he committed the offense while he was under extreme emotional influence. The judge noted Robertson's demeanor during the videotaped interrogation demonstrated otherwise. In addition, the judge considered that Robertson had been examined by medical professionals to determine if he suffered from a mental disease or defect and yet there was no such evidence at trial. The court also dismissed Robertson's age of 21 as a mitigating factor.

### Motion to Suppress

"In reviewing a trial court decision regarding the suppression of an accused's statements, '[this court examines] the factual underpinnings of the decision by a substantial competent evidence standard of review and review[s] the ultimate legal conclusion drawn from those facts de novo with independent judgment.' " *State v. Walker*, 276 Kan. 939, 944, 80 P.3d 1132 (2003). We are not free to reweigh the evidence and redetermine facts. *State v. Alvidrez*, 271 Kan. 143, 145, 20 P.3d 1264 (2001).

The State and the defendant agree that the defendant was in custody at all relevant times.

The rules regarding custodial interrogations and an accused's constitutional rights are well established. The right against self-

incrimination, including the right to have a lawyer present during custodial interrogation and the right to remain silent, is guaranteed by the Fifth Amendment to the United States Constitution. The United States Supreme Court requires that any waiver of these rights be knowing and intelligent. *Walker*, 276 Kan. at 944.

An accused may invoke his or her right to counsel at any time. The accused must make " 'some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police.*' " *Walker*, 276 Kan. at 944 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, 115 L. Ed. 2d 158, 111 S. Ct. 2204 [1991]). There are two aspects to this rule: "[T]he suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney' . . .[and] the request must be for assistance with the custodial interrogation, not for subsequent hearings or proceedings." *Walker*, 276 Kan. at 945.

The first part of the rule is governed by an objective standard: "If the desire for counsel is presented 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney,' no ambiguity or equivocation exists, and all questions must cease." *Walker*, 276 Kan. at 945. This court has stated that "it is good practice for the interrogator to ask clarifying questions" if an accused makes an ambiguous request for counsel; "however, it is not required and the questioning may continue." *Walker*, 276 Kan. at 945.

Once the accused has unambiguously invoked his or her right to counsel, questioning must cease. "Questioning can be resumed only after a lawyer has been made available or the suspect reinitiates conversation." *Walker*, 276 Kan. at 946. To ascertain whether the accused has waived a previously invoked right, "the court must first determine whether the accused actually invoked the right and, if so, whether the accused (1) initiated further discussions with police and (2) knowingly and intelligently waived the previously asserted right." *Walker*, 276 Kan. at 946-47. The State bears the burden of proving that the waiver of the previously asserted right was "knowing, voluntary, and intelligent under the totality of the

circumstances." *Walker*, 276 Kan. at 947. This cannot be shown by establishing that the accused "responded to further police-initiated custodial interrogation even if he has been advised of his rights[, and] . . . the accused's statements must evince 'a willingness and a desire for a generalized discussion about the investigation' and 'not merely [be] a necessary inquiry arising out of the incidents of the custodial relationship.' " *Walker*, 276 Kan. at 947 (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46, 77 L. Ed. 2d 405, 103 S. Ct. 2830 [1983]).

Under the facts of this case, Robertson made repeated requests for a lawyer, and Herzet demonstrated by his responses that he understood Robertson desired a lawyer's assistance. Although it was not completely clear that Robertson wanted a lawyer to be present for interrogation rather than later proceedings, we hold there was a valid waiver regardless.

As the district court recognized, before Herzet asked Robertson a single question about the crime, Robertson was blaming Jennifer and questioning her motive. Indeed, every time Robertson mentioned an attorney, he spontaneously reinitiated conversation with the officers about the crimes. Specifically, after Herzet was finally able to deliver the *Miranda* warnings, Robertson disclosed how he and Jennifer set the fire. This disclosure was not prompted by questioning from Herzet. Herzet then asked Robertson if he wanted to continue talking about the case. Robertson responded that he had signed the *Miranda* form and would speak with Herzet but might not answer all of his questions. He also advised Herzet that he had been arrested before and therefore understood his *Miranda* rights and his ability to waive them.

We conclude under the totality of the circumstances that the facts found by the trial court were supported by substantial competent evidence, and we arrive at the independent legal conclusion that Robertson's motion to suppress his statement to Herzet was properly denied.

We are of a similar mind regarding Robertson's oral statement to Hopper and his written statement. Robertson received his *Miranda* warnings from Hopper time and time again. In the face of those warnings, his behavior virtually defined the old phrase, "a

compulsion to confess." Robertson repeatedly reinitiated general discussion of the offense and his role in it. Hopper, finally, merely cautioned Robertson to tell the truth. Again, under the totality of the circumstances, we see substantial competent evidence to support the district court's factual findings and are satisfied that, as a matter of law, Robertson's motion to suppress his oral statement to Hopper and his written statement merited denial.

## Prosecutorial Misconduct

Robertson next argues the prosecutor committed misconduct by showing the jury language on the definition of premeditation, when an instruction using that language had been proposed and rejected. He asserts the instruction misstated the law and confused the jury because it conflicted with the PIK definition of premeditation already given. This confusion, he contends, was evidenced by the jury's later request for a copy of the language during deliberations.

Our pattern of review for prosecutorial misconduct claims is well known:

"A two-step analysis is applied to allegations of prosecutorial misconduct. First, the court decides whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. Second, the court must decide whether the comments constitute plain error, that is, whether the statements are so gross and flagrant as to prejudice the jury against the defendant and deny him or her a fair trial, thereby requiring reversal. The facts of each case must be scrutinized in determining whether a prosecutor's remarks deny the defendant a fair trial. If the prosecutor's statements rise to the level of violating a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs without regard to a contemporaneous objection." *State v. Tosh,* 278 Kan. 83, 85, 91 P.3d 1204 (2004).

Robertson's claim of misconduct is without merit. The language used by the State regarding premeditation was a correct and often-repeated statement of Kansas law. See *State v. Boone,* 277 Kan. 208, Syl. ¶ 10, 83 P.3d 195 (2004); *State v. Hebert,* 277 Kan. 61, 84, 82 P.3d 470 (2004); *State v. Hoge,* 276 Kan. 801, 814-15, 80 P.3d 52 (2003); *Pabst,* 268 Kan. at 512-13. It does not contain a definition of premeditation contrary to that in PIK. It merely offers factors a jury may consider in determining whether the PIK definition was met in a given case. The jury's question is more consis-

tent with its members finding the language helpful rather than confusing.

The prosecutor's comments and use of the overhead projector to show the jury the language on premeditation factors were well within the wide latitude granted the State during closing argument. The prosecutor relied on established Kansas law and drew reasonable inferences from the evidence. There was no misconduct; thus we do not reach the question of plain error.

### Sufficiency of Premeditated Murder Evidence

Robertson argues that there was insufficient evidence to prove first-degree murder beyond a reasonable doubt because of lack of proof on premeditation. He emphasizes he was surprised by Jennifer's attack on her mother and, when he tried to stop it, he was injured. He thought he and Jennifer went to the house only to get clothes and food and to see the cat.

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Beach,* 275 Kan. 603, Syl. ¶ 2, 67 P.3d 121 (2003). "Circumstantial evidence may establish even the gravest offenses." *State v. Davis,* 275 Kan. 107, 118, 61 P.3d 701 (2003) (citing *State v. Murillo,* 269 Kan. 281, 286, 7 P.3d 264 [2000]).

As we observed above in relation to Robertson's prosecutorial misconduct claim, it is correct that "[p]remeditation may be inferred by the jury from various circumstances, including (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, or (5) the dealing of lethal blows after the deceased was felled and rendered helpless." *Boone,* 277 Kan. 208, Syl. ¶ 10.

In this case, when the evidence is viewed in the light most favorable to the prosecution, several of these factors are present: (1) Robertson made a threat against Jennifer's parents, and her parents' behavior demonstrated fear of him and Jennifer; (2) Robert-

son was carrying one of the knives used to stab Patricia; (3) the phone line was cut before Jennifer knocked on the door; (4) Robertson participated in stabbing Patricia; (5) after stabbing Patricia numerous times, Jennifer retrieved a bigger knife; (6) Patricia tried to crawl away, but Jennifer and defendant grabbed her feet and pulled her back into the living room; (7) they then stomped on Patricia's head and neck until she stopped making gurgling noises; (8) Robertson took a shower and tended to his cut hand as Patricia lay on the floor dying or already dead; (9) he and Jennifer used an accelerant and set the house on fire; and (10) the attack on Patricia was unprovoked.

We have no hesitation in concluding that the State presented ample evidence of premeditation. A reasonable juror could have found the defendant guilty of first-degree murder beyond a reasonable doubt.

### Voluntary Manslaughter Instruction

Robertson next challenges the district judge's refusal to instruct on voluntary manslaughter.

"In a criminal action, a trial court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. When considering the refusal of the trial court to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction. [Citation omitted.]" *State v. Gholston,* 272 Kan. 601, 615, 35 P.3d 868 (2001), *cert. denied* 536 U.S. 963 (2002).

"A defendant is entitled to an instruction on his or her theory of the case even though the evidence thereon is slight and supported only by the defendant's own testimony. [Citation omitted.]" *State v. Barnes,* 263 Kan. 249, 265, 948 P.2d 627 (1997).

Voluntary manslaughter is defined by K.S.A. 21-3403(a) as: "[T]he intentional killing of a human being committed . . . [u]pon a sudden quarrel or in the heat of passion."

Heat of passion is defined as "any intense or vehement emotional excitement which was spontaneously provoked from circumstances. Such emotional state of mind must be of such degree as would cause an ordinary person to act on impulse without reflection." PIK Crim. 3d 56.04(e).

" 'Whether a provocation is legally sufficient is an objective, rather than a subjective, determination. To be legally sufficient to intentionally kill an individual, a provocation must consist of more than mere words or gestures, and if assault or battery is involved the defendant must have a reasonable belief that he or she is in danger of great bodily harm or at risk of death. A provocation is legally sufficient if it is calculated to deprive a reasonable person of self-control and to cause the person to act out of passion rather than reason.' " *State v. Ordway*, 261 Kan. 776, 785, 934 P.2d 94 (1997) (quoting *State v. Cheeks*, 258 Kan. 581, Syl. ¶ 7, 908 P.2d 175 [1995]).

Even when viewed in the light most favorable to Robertson, the evidence did not support an instruction on voluntary manslaughter. According to Robertson's statements, Jennifer attacked her mother. When he tried to stop her, he was cut. He then joined in, apparently without reservations — stabbing Jennifer's mother, pulling her back into the living room when she tried to crawl away, and stomping on her neck and face to silence her. A cut to the hand is not sufficient provocation for an ordinary person to lose all self-control and participate in this grisly homicide or the setting of a fire designed to cover it up.

Further, even if the failure to give the instruction would otherwise have constituted error, the "skip rule" precludes reversal. See *State v. Horn*, 278 Kan. 24, 43, 91 P.3d 517 (2004). *Horn*, 278 Kan. at 43, states: "When a lesser included offense has been the subject of an instruction, and the jury convicts of the greater offense, error resulting from failure to give an instruction on another still lesser included offense is cured. [Citations omitted.]"

In this case, the jury was instructed on first-degree murder and the lesser included offense of second-degree murder. The jury found defendant guilty of first-degree murder. Because the jury failed to find the defendant guilty of the lesser included offense of second-degree murder, the judge's refusal to give the still lesser included instruction on voluntary manslaughter cannot be reversible error.

### Cumulative Error

Robertson's last attack on his murder conviction rests on the doctrine of cumulative error. See *State v. Plaskett*, 271 Kan. 995, 1022, 27 P.3d 890 (2001).

Having found no error, as discussed above, we cannot conclude Robertson's trial was infected by reversible cumulative error.

### Sufficiency of Hard 50 Evidence

Robertson's first challenge to his hard 50 sentence asserts that the district judge lacked substantial, competent evidence to support the aggravating factor of a heinous, atrocious, or cruel murder; that the judge failed to credit several pertinent mitigating factors; and that the required statutory balance between aggravating and mitigating factors therefore tipped the wrong direction. See K.S.A. 2004 Supp. 21-4635.

K.S.A. 2004 Supp. 21-4636 sets forth circumstances that can lead to a finding that a defendant committed a murder in an especially heinous, atrocious, or cruel manner.

"(f) . . . A finding that the victim was aware of such victim's fate or had conscious pain and suffering as a result of the physical trauma that resulted in the victim's death is not necessary to find that the manner in which the defendant killed the victim was especially heinous, atrocious or cruel. In making a determination that the crime was committed in an especially heinous, atrocious or cruel manner, any of the following conduct by the defendant may be considered sufficient: . . . (3) infliction of mental anguish or physical abuse before the victim's death; (4) torture of the victim; [and] (5) continuous acts of violence begun before or continuing after the killing."

Our standard of review is "whether, after a review of all the evidence, viewed in the light most favorable to the State, a rational factfinder could have found by a preponderance of the evidence the existence of the aggravating circumstance." *State v. Spain*, 263 Kan. 708, Syl. ¶ 6, 953 P.2d 1004 (1998).

When the evidence in this case is viewed in the light most favorable to the State, it supports a finding that the murder of Patricia Self was committed in an especially atrocious, heinous, or cruel manner. Robertson and Jennifer held Patricia down and repeatedly stabbed her. When Patricia tried to crawl away, Jennifer and Robertson grabbed her and pulled her back. When she made a gurgling noise, they stomped on her face and neck to silence her. They then used an accelerant to set her house on fire. These facts meet the standards set out in K.S.A. 2004 Supp. 21-4636(f)(3), (4), and (5).

Our standard of review on the district judge's weighing of aggravating and mitigating factors is abuse of discretion. See *State v. Boldridge*, 274 Kan. 795, Syl. ¶ 10, 57 P.3d 8 (2002), *cert. denied* 538 U.S. 950 (2003). "Judicial discretion is abused . . . when no reasonable person would have taken the position that was taken by the trial court. [Citation omitted.]" *Hebert*, 277 Kan. at 77.

The record contradicts Robertson's assertions about the inadequacy of the district judge's weighing. The judge carefully considered the mitigating factors proposed by the defense before rejecting them. In addition, the judge explicitly performed the proper weighing analysis on the record. K.S.A. 2004 Supp. 21-4635(d) requires that the district court must determine whether the aggravating factors are outweighed by the mitigating factors. Here, the district judge weighed the one aggravating factor — that the crime was committed in an especially heinous, atrocious, or cruel manner — against the absence of any persuasive mitigating factors. There was no abuse of discretion.

### *Hard 50 Constitutionality*

Robertson's final issue is the constitutionality of the hard 50 sentencing scheme. He urges us to revisit our decision in *State v. Conley*, 270 Kan. 18, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001), in light of the United States Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466, 494, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and *Jones v. United States*, 526 U.S. 227, 243, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999).

This court has considered the cited Supreme Court decisions and nevertheless upheld the hard 50 sentence and *Conley* as constitutional. See, *e.g., State v. Wilkerson*, 278 Kan. 147, 160, 91 P.3d 1181 (2004); *Hebert*, 277 Kan. at 108; *State v. Boldridge*, 274 Kan. 795, 812, 57 P.3d 8 (2002), *cert. denied* 538 U.S. 950 (2003). We decline to do otherwise now.

Affirmed.

GERNON, J., not participating.