(207 P.3d 1072)
No. 98,998

STATE OF KANSAS, *Appellee*, v. MIGUEL D. MENDOZA, *Appellant.*

Opinion filed May 22, 2009.

*Michelle Davis*, of Kansas Appellate Defender Office, for appellant.

*David E. Yoder*, county attorney, and *Stephen N. Six*, attorney general, for appellee.

Before RULON, C.J., ELLIOTT and HILL, JJ.

HILL, J.: This appeal raises the question of whether the State can charge two stabs of a knife attack as two distinct counts of aggravated battery. When several charges arise from the same conduct, under Kansas law there can be only one conviction for each unit of prosecution. The scope of conduct comprising one violation of a criminal statute defines the unit of prosecution.

In this direct appeal, Miguel D. Mendoza was convicted of one count of aggravated battery of the penis and one count of aggravated battery of the right leg of Raul C. Lopez. Because Mendoza cut Lopez' penis after stabbing him in the right leg, stomach, arm, and other body parts and because all of this happened in the same room as part of the same altercation, we hold these charges and convictions arose from the same conduct. Going further, because our aggravated battery statute encompasses all physical harms, disfigurements, and physical contacts *on the person* and not on separate body parts, we hold the unit for prosecution of the aggravated battery statute is the person harmed. Therefore, in our view the two aggravated battery convictions here cannot stand since they arose from the same conduct, and by law, there can be only one aggravated battery conviction for this knife attack on Lopez' person. Each stab or cut is not a separate crime. We therefore reverse one conviction of aggravated battery and remand the case for resentencing and correction of Mendoza's criminal history by removing one aggravated battery conviction.

*The facts reveal a surprise attack from a bedroom closet.*

On June 11, 2000, at 2:30 a.m., Sergeant Mark Smith was dispatched to the Country Club Estates in Newton, where he found Debra Winters with a towel wrapped around her right wrist. Winters said that when she was in her bedroom with another man, her ex-boyfriend, Miguel D. Mendoza, jumped out of the closet with two butcher knives. Winters claimed Mendoza stabbed her and the other man. She said Mendoza then drove off in her vehicle.

Smith looked inside Winters' trailer and saw blood everywhere. When he walked around the back side of the trailer, Smith saw

Raul Lopez lying on the ground, bleeding profusely. The officer found a bloody butcher knife about 10 feet from the trailer.

*More details of the attack come out at the trial.*

Earlier, during the evening of June 10, Winters had gone to Wichita where she met Lopez. Winters and Lopez went back to Winters' trailer and went into Winters' bedroom and laid down in bed. At that time, Winters heard the closet doors rattle and saw Mendoza come out. She testified Mendoza was angry and was holding two knives. He lunged after her, struck at her, and cut her hand. But when Lopez grabbed an alarm clock and threw it at Mendoza, Winters took off running out the front door and ran to another residence and called 911. Winters later saw Mendoza exit her trailer and leave in her car.

Lopez testified there was no indication that anyone was in the trailer when he and Winters entered. After he and Winters got in bed, Lopez heard noises and saw someone come out of the closet. Lopez testified the person, later identified as Mendoza, looked angry and was holding a knife in each hand with the blades pointed toward Lopez and Winters. Lopez testified Mendoza said he was going to kill him. Mendoza first went after Winters and struck her with a knife. Lopez then threw an alarm clock at Mendoza, and Winters ran out. Mendoza attempted to follow and grab Winters but came back and began to attack Lopez with the knives. Lopez was first struck in the right leg. Lopez fell down on the carpet and was lying on his back. Mendoza then started to knife Lopez in the stomach. As some defense, Lopez covered his face and chest. Mendoza then put the knife in Lopez' arm. Lopez was also stabbed in the buttocks and right thigh. Mendoza then pulled down Lopez' undershorts and cut his penis. Mendoza then said he was going to go get Winters so he could kill her next to Lopez and left the room. Lopez testified he got up, left the trailer, and fell down outside.

Mendoza admitted he went to the trailer on June 10, where he claimed he saw Winters and Lopez standing at the door of the bedroom. Mendoza testified Lopez hit him with an alarm clock, which made him angry, and he and Lopez started to fight, moving down the hallway. Mendoza stated they both saw a knife and tried

to grab it. Mendoza claimed they both received injuries and only admitted to striking Lopez in the stomach.

*The relationship between Winters and Mendoza involved many threats of violence.*

Winters testified she and Mendoza began dating in the early spring of 1999. They moved to a trailer located in Country Club Estates in 2000. Winters testified Mendoza threatened her many times during their relationship. One of the main things Mendoza said was that he would cut an "M" in Winters' face so she would remember him every time she looked in the mirror. Winters testified Mendoza made this particular statement back in 1999 and also several times during the time they split up. Witness Misty Penny testified she heard Winters and Mendoza fighting in September 1999 and heard Mendoza tell Winters he was going to put an "M" on her forehead. Winters also claimed Mendoza threatened to kill, shoot, and stab her between January and June 2000. Winters also testified Mendoza threatened to kill her and put an "M" on her face if he caught her with another man.

Winters testified she told Mendoza to leave the trailer sometime prior to June 11, 2000. During the time of their breakup, Mendoza came to El Toro, her place of work, and threatened to kill her. Sergeant Scott Powell, who was dispatched to El Toro on June 3, testified Winters reported that Mendoza had been arrested for coming to El Toro because he had shown up that day and refused to leave. Powell found Mendoza less than a block away from El Toro. Witness Brenda Larez testified that Mendoza came into the restaurant and said he was going to kill Winters.

The State charged Mendoza with attempted first-degree murder of Winters, attempted first-degree murder of Lopez, aggravated battery of Lopez' penis, aggravated battery of Lopez' right leg, aggravated burglary, aggravated battery of Winters, criminal threat of Winters on June 3, criminal threat of Winters by telling her he would kill her if she were with another man, criminal threat of Winters by threatening to cut a letter "M" in her face, and theft of Winters' vehicle. The jury convicted Mendoza on all ten counts.

In his appeal, Mendoza contends his aggravated battery convictions are multiplicitous, his criminal threat convictions are multiplicitous, and the court should have given a limiting instruction when it admitted evidence of his prior crimes. Finally, he argues the trial court incorrectly instructed the jury about heat of passion and the prosecutor made improper comments about the definition of voluntary manslaughter. We will deal with the issues in that order.

*We examine the aggravated battery convictions.*

Originally, the State charged Mendoza with one count of aggravated battery of Lopez. At the preliminary hearing, the State asked to amend the complaint and charge Mendoza with an additional count of aggravated battery, specifying one charge for cuts on the penis and one charge for the severe injury to the right leg. Mendoza objected. The district court allowed the additional count, noting multiplicity issues "would be addressed at sentencing." Thereafter, the charge was one count aggravated battery of the right leg and one count aggravated battery of the penis.

Our Kansas Supreme Court in *State v. Schoonover*, 281 Kan. 453, 462-505, 133 P.3d 48 (2006), established the framework for examining multiplicity issues. The court held that to violate double jeopardy, two components must be met: (1) The convictions must arise from the same conduct and (2) by statutory definition, there must be only one offense. 281 Kan. 453, Syl. ¶ 15. We must therefore determine if the same conduct was involved here and then what the unit of prosecution is for aggravated battery.

When determining whether convictions arise from the same conduct, *Schoonover* suggested that courts consider: (1) whether the acts occurred at or near the same time; (2) whether the acts occurred at the same location; (3) whether there is a causal relationship between the acts, particularly whether there was an intervening event; and (4) whether there was a fresh impulse motivating some of the conduct. 281 Kan. at 497.

*Same conduct*

We look first at prior cases. In *State v. Potts*, 281 Kan. 863, 865-66, 135 P.3d 1054 (2006), the defendant Potts hit, grabbed, and

pushed V.H. when she refused sex. Potts threatened to kill V.H. Potts then became calm. When V.H. again refused sex, Potts forced sex. Holding Potts' convictions arose from the same conduct, the court on appeal explained:

"Potts' actions in this case occurred at nearly the same time and location. Although the defendant calmed down momentarily when he lay down on the bed, the record suggests that only a few minutes went by before he told V.H. to perform oral sex on him. All of the acts seemingly stemmed from V.H.'s refusal of Potts' sexual advances, and the evidence does not demonstrate a fresh impulse motivating some of the conduct. Rather, the evidence demonstrates that the charges arose out of the same continuous transaction involving Potts' violent reaction to V.H. repeatedly refusing his sexual advances." 281 Kan. at 872.

Compare *State v. Dorsey*, 224 Kan. 152, 156, 578 P.2d 261 (1978) (held three attempted rapes multiplicitous where separated by only a few minutes); *State v. Long*, 26 Kan. App. 2d 644, 645-50, 993 P.2d 1237 (1999), *rev. denied* 268 Kan. 892 (2000) (held five rape convictions not multiplicitous where defendant raped victim in three different rooms in various positions within 1-or 2-hour period).

We look now at the facts of this case. Lopez testified Mendoza first stabbed him in the right leg. Lopez then fell down on the carpet and was lying on his back, and Mendoza started to knife Lopez in the stomach, while Lopez covered his face and chest. Mendoza then stabbed the knife into Lopez' arm. Lopez was also stabbed in the buttocks and right thigh. Lopez testified that at no point did Mendoza stop attacking him until he left the room. Lopez stated that when he was still lying on the floor, Mendoza "finished attacking" him by pulling down his undershorts and cutting his penis. Mendoza told Lopez he was going to go get Winters so he could kill her next to Lopez and then left the room.

Applying the *Schoonover* factors, it appears the aggravated battery convictions indeed arose from the same conduct. First, the stabs occurred at or near the same time. Although the record fails to establish a time frame, Lopez' testimony indicates Mendoza cut his penis immediately after stabbing his right leg, stomach, arm, and other body parts. Second, the batteries occurred at the same location. Lopez' testimony does not indicate he and Mendoza

changed location during the time Mendoza stabbed his right leg and cut his penis. Third, there was a causal relationship between the batteries in that both were done in a concerted effort to seriously harm or kill Lopez for engaging in a relationship with Winters. Fourth, the record reveals no fresh impulse motivating Mendoza's final act of cutting Lopez' penis. Instead, it appears the sequence of stabs was one continuous altercation and the record reveals no evidence of an intervening event. We must now look at the statute.

### The unit of prosecution

When there are multiple counts for violation of a single statute, *Schoonover* stated the test to determine whether there is only one offense is to determine how the legislature has defined the scope of conduct that comprises a violation of the statute. 281 Kan. at 497. The court explained that the statutory definition of the crime determines what the legislature intended as the allowable unit of prosecution. There can be only one conviction for each allowable unit of prosecution.

We first look at prior cases. In *State v. Gomez*, 36 Kan. App. 2d 664, 143 P.3d 92 (2006), the defendant (Gomez) was charged and convicted of two counts of criminal discharge of a firearm. The charges stemmed from an incident in which Gomez fired shots at a vehicle in which both Kutilek and Swiler were located. On appeal, Gomez argued the convictions were multiplicitous because the statute only prohibited discharge into a vehicle in which a human being is present. Gomez argued that the fact there was more than one human being in the vehicle was immaterial.

The first component of *Schoonover* was satisfied in *Gomez*, as neither party argued the convictions did not arise from the same conduct. See 281 Kan. at 496-97; 36 Kan. App. 2d at 669-70. The court then applied *Schoonover*'s "unit of prosecution" test because Gomez challenged multiple violations of a single statute. 36 Kan. App. 2d at 670-71. The court noted that the key in determining the minimum unit of prosecution is legislative intent, a determination dependent upon the nature of the conduct proscribed. 36 Kan. App. 2d at 670. The court noted that the court in *United*

*States v. Chipps*, 410 F.3d 438, 447-48 (8th Cir. 2005), was presented with deciding whether Congress intended to punish assault as a course of conduct or as separate individual acts within an assaultive episode. *Chipps* ultimately held that because Congress had not specified the unit of prosecution with clarity, the rule of lenity applied. 410 F.3d at 449. The court therefore resolved doubt in Chipps' favor and interpreted assault as a "course-of-conduct offense." 410 F.3d at 449.

Holding that Gomez' convictions were multiplicitous, *Gomez* reasoned that the statutory language did not state that each occupant is presence in the vehicle constituted an additional violation. 36 Kan. App. 2d at 672-73. The court stated: "As our Supreme Court instructed in *Schoonover*, it is the language of the statute, not the number of persons injured, which controls. [Citation omitted.]" 36 Kan. App. 2d at 672. The court reasoned that although the legislature could have provided that each occupant's presence constitutes a separate violation of the statute, it did not do so. 36 Kan. App. 2d at 673.

In *State v. Thompson*, 287 Kan. 238, 200 P.3d 22 (2009), the court similarly reasoned that the legislature did not state whether possession of each item listed in K.S.A. 65-7006 could be prosecuted separately and the unit of prosecution was not defined by the language of the statute when holding that multiple convictions under the same statute were multiplicitous. 287 Kan. at 246-52.

Turning to the aggravated battery statute, K.S.A. 21-3414(a) defines aggravated battery as:

"(1)(A) Intentionally causing great bodily harm to another person or disfigurement of another person; or

(B) intentionally causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted; or

(C) intentionally causing physical contact with another person when done in a rude, insulting or angry manner with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted; or

"2)(A) recklessly causing great bodily harm to another person or disfigurement of another person; or

(B) recklessly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted."

The statutory language clearly indicates aggravated battery is inflicted upon another person. The nature of the conduct proscribed appears to encompass all physical harms, disfigurements, and physical contacts inflicted upon the person. See *Gomez*, 36 Kan. App. 2d at 670. As the *Gomez* court reasoned, the statute does not state that harm to each individual body part constitutes a separate violation of the statute. See 36 Kan. App. 2d at 672. The legislature could have provided this language when enacting K.S.A. 21-3414 but chose not to do so. Thus, the unit of prosecution is the person harmed. The district court erred in permitting two convictions for aggravated battery of the same person. See *Schoonover*, 281 Kan. at 497-98.

The State argues this was harmless because the aggravated battery sentences were made concurrent to the attempted first-degree murder sentences. We disagree. In *Gomez*, the court noted that when there are multiplicitous convictions, the defendant should only be sentenced on the more severe offense, and it reversed one conviction and ordered that the district court resentence Gomez because the sentences were consecutive. 36 Kan. App. 2d at 673. Here, the severity level of the aggravated battery charges are identical. We reverse the aggravated battery of the penis conviction because it was added later and remand to the district court for resentencing and to remove the additional conviction from Mendoza's criminal history score, as the inclusion of this conviction would adversely affect that score.

*We now examine the criminal threat convictions.*

Mendoza next argues that two of three convictions for criminal threat were multiplicitous. Count 8 charged Mendoza with criminal threat in violation of K.S.A. 21-3419(a)(1) for telling Winters he would "kill her if she were to be with another man, or words to that effect." Count 9 charged Mendoza with violating the same statute for threatening to cut a letter "M" in Winters' face. In Mendoza's view, the jury could have found these statements were made during the same time period and that the State did not establish the statements were made during separate incidents, noting Winters testified that Mendoza made a threat containing both

statements. He argues the unit of prosecution for criminal threat is the actual threat, not the various statements that comprise the threat.

We must apply the *Schoonover* factors here. *First,* the record fails to establish whether Mendoza's statements were made at or near the same time. The record only establishes that the statements were made between 1999 and June 2000. *Second,* the record fails to establish whether the statements were made at the same location. Other than Penny's testimony, the testimony fails to establish where any of the statements were made. *Third,* although there is likely a causal relationship between the statements, as they were both clearly made in an effort to threaten Winters, there is no evidence regarding intervening events or fresh impulse.

Based on the above, there is no evidence that the statements arose from the same conduct or were part of one transaction. The appellant has the burden to establish a record supporting his claim on appeal. *City of Mission Hills v. Sexton,* 284 Kan. 414, 435, 160 P.3d 812 (2007). "If the conduct is discrete, *i.e.,* committed separately and severally, the convictions do not arise from the same offense and there is no double jeopardy violation." *Schoonover,* 281 Kan. at 496. Because there is no evidence Mendoza's convictions for criminal threat arose from the same conduct, the convictions are not multiplicitous, and Mendoza was properly convicted.

*Mendoza failed to object to the K.S.A. 60-455 evidence.*

In this issue, Mendoza claims the State elicited extensive testimony about uncharged crimes, focusing on the many times Mendoza threatened Winters during their relationship.

Mendoza failed to object at trial to the admission of K.S.A. 60-455 evidence he now challenges. Evidence admitted by authority of K.S.A. 60-455 must be objected to at trial in order to preserve the issue for appeal. See *State v. Gaither,* 283 Kan. 671, 689-90, 156 P.3d 602 (2007); *State v. Francis,* 282 Kan. 120, 138, 145 P.3d 48 (2006); K.S.A. 60-404. Thus, Mendoza failed to preserve the issue for purposes of appeal, and this court will not address the issue.

*We examine the "heat of passion" issue raised by Mendoza.*

Mendoza finally challenges both the district court's jury instructions defining "heat of passion" and the prosecutor's closing statement defining voluntary manslaughter. We note that he did not object to either. Therefore, we examine the instruction complaint for clear error, see *State v. Castoreno*, 255 Kan. 401, 403-04, 874 P.2d 1173 (1994), and the prosecutor's comments to see if any error was harmless or rises to the level of violating the defendant's constitutional rights to a fair trial and due process. *State v. Kunellis*, 276 Kan. 461, 467, 78 P.3d 776 (2003).

K.S.A. 21-3403(a) defines voluntary manslaughter as the intentional killing of a human being committed upon a sudden quarrel or in the heat of passion. PIK Crim. 3d 56.04(e) states that heat of passion is "any intense or vehement emotional excitement which was spontaneously provoked from circumstances" and that "[s]uch emotional state of mind must be of such degree as would cause an ordinary person to act on impulse without reflection." Our Supreme Court recently agreed that heat of passion is any intense or vehement emotional excitement prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror, that would cause an ordinary man to act on impulse without reflection. *State v. Vasquez*, 287 Kan. 40, 54, 194 P.3d 563 (2008) (citing *State v. Guebara*, 236 Kan. 791, 796-97, 696 P.2d 381 [1985]).

Here, the court instructed the jury that the elements of voluntary manslaughter are (1) the defendant intentionally killed, (2) upon a sudden quarrel or in the heat of passion, and (3) on June 11, 2000. The jury was provided the definition of "heat of passion" set forth in PIK Crim. 3d 56.04(e). In closing, the prosecutor stated, "Voluntary manslaughter is sudden passion, sudden quarrel. Trying to kill but not developing the intention to kill. It's kind of an unintentional—it is an intentional killing but not intending to kill."

Mendoza challenges the prosecutor's statement that voluntary manslaughter is sudden passion. He emphasizes that the concept of "sudden passion" was based on an earlier version of the manslaughter statute that required a killing "without a design to effect

death." Mendoza suggests that because the phrases "impulse without reflection" and "spontaneously provoked" were used when the "sudden passion" statute was in effect, these phrases now should be discarded. Thus, Mendoza challenges the jury instructions in this regard as well.

We are not convinced for two reasons. *First*, it is very unlikely the prosecutor's use of the phrase "sudden passion" misled the jury. The Supreme Court has held that "heat of passion" is not a concept that is "so foreign to the vocabulary of the average juror as to require definition." *State v. Stafford*, 223 Kan. 62, 66, 573 P.2d 970 (1977). Moreover, PIK Crim. 3d 56.04(e) defines heat of passion as excitement spontaneously provoked that causes an ordinary person to act on impulse without reflection. It is not a far stretch to characterize the passion required as "sudden."

*Second*, our Supreme court has recognized the "impulse without reflection" and "spontaneously provoked" phraseology set forth in PIK Crim. 3d 56.04(e) since the date of the cases cited by Mendoza and has never suggested this language is outdated or improper. See *State v. Gallegos*, 286 Kan. 869, 874-75, 190 P.3d 226 (2008); *State v. Brown*, 285 Kan. 261, 301-02, 173 P.3d 612 (2007); *State v. Robertson*, 279 Kan. 291, 305-06, 109 P.3d 1174 (2005).

Citing *State v. Follin*, 263 Kan. 28, 37-38, 947 P.2d 8 (1997), Mendoza argues that it makes no sense to require that a killing be sudden or spontaneous because case law allows for a reasonable passage of time after provocation for passion to cool. Indeed, the court in *Follin* explained that heat of passion dissipates as time passes. 263 Kan. at 37-38. This suggests there may be some time frame after the event causing heat of passion has passed in which a subsequent killing would still be considered voluntary manslaughter. Nevertheless, this idea does not alter the long-recognized concepts of *impulse, sudden action, or spontaneity as it pertains to* voluntary manslaughter. See *State v. Henson*, 287 Kan. 574, 583, 197 P.3d 456 (2008) (noting district court determination voluntary manslaughter instruction was not warranted because 20 to 30 minutes passed between punch and shooting is supported by law).

Next, Mendoza complains the prosecutor incorrectly told the jury that an intent to kill was not required for purposes of voluntary

manslaughter. Indeed, the prosecutor in closing inartfully described voluntary manslaughter as [t]rying to kill but not developing the intention to kill. It's kind of an unintentional—it is an intentional killing but not intending to kill." K.S.A. 21-3403(a) defines voluntary manslaughter as an intentional killing. Thus, the prosecutor's statement indicating voluntary manslaughter does not involve an intent to kill was clearly incorrect and confusing to the jury. Nevertheless, when the defendant fails to object to alleged prosecutorial error at trial, this court must consider whether the error was harmless. *Kunellis*, 276 Kan. at 467.

Here, the jury was correctly instructed that voluntary manslaughter is an intentional killing. Moreover, there is ample evidence to support Mendoza's convictions for attempted first-degree murder (*i.e.*, any overt act toward the perpetration of killing a human being intentionally and with premeditation by a person who intends to commit the crime but fails in the perpetration or is prevented or intercepted in the execution). K.S.A. 21-3301(a); K.S.A. 21-3401(a).

Lopez and Winters testified there was no sound or signal that anyone was in the trailer when they entered, although Winters noticed a pantry door was open. Both testified Mendoza came out of the bedroom closet holding two knives pointed toward them. Winters testified Mendoza had on white gloves. Winters testified that when she returned to her trailer at a later time, she discovered the two largest knives from her butcher block were missing. Winters found a hammer and curling iron, both normally kept elsewhere, inside the closet from which Mendoza emerged.

Mendoza admitted he went to the trailer on June 10 but testified he saw Lopez and Winters standing at the door of the bedroom, and that Lopez hit him with an alarm clock which made him get angry, and they started to fight. Mendoza stated both he and Lopez saw a knife and tried to grab it, and both received injuries. Notably, Mendoza's own testimony did not appear to claim heat of passion for purposes of voluntary manslaughter but suggested self-defense.

The above facts indicate Mendoza's actions were both inten-tional and premeditated. Thus, the prosecutor's statement was harmless and is not a reason for reversal of Mendoza's convictions.

Affirmed in part, reversed in part, and remanded with directions.